UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHRISTOPHER C. DAVIDSON,<br>Plaintiff,<br><br>vs.<br><br>DEUTSCHE BANK SECURITIES, INC.,<br>DEUTSCHE BANK AMERICAS<br>HOLDING CORPORATION, and<br>DEUTSCHE BANK AMERICAS<br>SEVERANCE PAY PLAN,<br><br>Defendants | Civil Action No. 1:04-cv-11027-RGS |

## DEFENDANTS' MOTION TO DISMISS ALL COUNTS AND MEMORANDUM OF REASONS IN SUPPORT THEREOF

Pursuant to Fed. R. Civ. P. 12(b)(6), defendants Deutsche Bank Securities, Inc., Deutsche Bank Americas Holding Corporation, and Deutsche Bank Americas Severance Pay Plan (sometimes "defendants"), move to dismiss plaintiff's Complaint in its entirety, for the reasons discussed below.

## INTRODUCTION

This action is brought by a former at-will sales employee of Deutsche Bank Securities, Inc. ("Deutsche Bank"), who was terminated after approximately three years of employment. During his employment, which began in early 2001, he was paid a base salary of $125,000; a guaranteed incentive award of $875,000 for the year ending 2001; and discretionary incentive awards for 2002 and 2003. He was also granted restricted equity units in Deutsche Bank AG, which were to vest over a period of years in accordance with a written plan.

When plaintiff was terminated on March 16, 2004, he was offered 12 weeks of salary as severance pay.  Deutsche Bank notified him that his restricted equity units would continue to vest after termination, subject to various conditions applicable to all participants in the company's equity plan, including compliance with a prohibition on soliciting Deutsche Bank's customers during the vesting period.  Plaintiff, however, claims that he should receive more, and sues for:  (1) some undefined amount of a discretionary (and undetermined) incentive award he claims he might have been given had he remained employed by Deutsche Bank throughout 2004; (2) additional severance pay in an indeterminate amount of "up to" 50% of the incentive award he received for 2003; and (3) a declaration that he should be permitted to continue vesting his restricted equity units in Deutsche Bank <u>even if he violates the company's equity plan by soliciting Deutsche Bank's customers</u>.  For the reasons discussed below, all of plaintiff's claims fail as a matter of law.

## <u>PLAINTIFF'S ALLEGATIONS</u>[1]

Davidson began employment with Deutsche Bank in early 2001 as a vice president and salesperson.  Complaint ("Cp."), ¶5.  His employment was at will.  Cp., Exhibit A (at third page).  Pursuant to an offer letter from Deutsche Bank dated February 7, 2001 (the "Employment Letter"), Davidson was paid a base salary of $125,000 per year.  Cp., ¶6, and Exhibit A thereto.  The Employment Letter stated that Davidson would also be eligible to receive a conditional incentive bonus "in an amount <u>contingent</u> upon the <u>profitability</u> of Deutsche Bank's operations, the performance of your <u>division</u>,

---

[1]     For purposes of this motion, defendants rely on plaintiff's allegations and on the documents attached to plaintiff's Complaint.  The Court may consider the exhibits to the Complaint on this motion to dismiss because, under Fed. R. Civ. P. 10(c), they are deemed to be part of the Complaint "for all purposes," including a motion under Rule 12(b)(6).  *See, e.g., Blackstone Realty LLC v. F.D.I.C.*, 244 F.3d 193, 195 n. 1 (1st Cir. 2001).

and your <u>individual contribution</u>."  Cp., ¶6, and Exhibit A (emphasis added).  For the

year ending December 31, 2001, the Employment Letter guaranteed Davidson an

incentive bonus of no less than $875,000.  Cp., ¶6, and Exhibit A.[2]  In contrast with this

guarantee for the first year, the letter did <u>not</u> provide any guarantees with respect to either

the payment or the amount of any incentive compensation for any other year.  Cp., ¶6,

and Exhibit A.

Plaintiff received discretionary incentive awards for 2002 and 2003, including an

award of $251,094 for 2003.  Cp., ¶13.  In 2002 and 2003, Davidson also received

awards of restricted equity units for shares in Deutsche Bank AG ("REU Awards").  Cp.,

¶8, and Exhibit C, §2.1 (defining "DB" and "DB Shares") (page 10).  These equity unit

awards were governed by Deutsche Bank's Restricted Equity Unit Plan (the "REU

Plan").  Cp., ¶8, and Exhibit C.  The REU Plan provides that each REU Award

"represents a <u>contingent</u> right, subject to the terms and conditions in [the] Plan rules," to

receive shares in Deutsche Bank AG upon a future vesting date.  Cp., Exhibit C, § 4.1

(page 12) (emphasis added).  Section 4.5 of the REU Plan provides that the dates on

which REU awards will vest are set forth on the award statements for such awards.  Cp.,

Exhibit C, §4.5(b) (at pages 12-13).  The REU Plan further provides that, until they vest,

REU Awards "will be subject to certain <u>restrictions</u>, which, if violated, could result in the

<u>forfeiture</u> of a portion or all of [an] <u>unvested</u> Award."  Cp., Exhibit C (at page 2)

(emphasis added).  The REU Plan sets out the "details necessary to enable [a plan

participant] to preserve [his] eligibility to receive a distribution from [his] Award in the

---

[2]    Specifically, Davidson's Employment Letter provided that he would receive a "minimum guaranteed incentive bonus award of not less that $875,000 (less statutory withholdings) for the year ending December 31, 2001 (the 'Guaranteed Incentive Bonus')," and that, for that year, "the cash portion of the Guaranteed Incentive Bonus will not be less than 70% of the total award."  Cp., ¶6, and Exhibit A.

future."  Cp., Exhibit C (at pages 1 and 2).  Of particular relevance to this matter, §5.1(d) of the REU Plan provides that any unvested REU shall be automatically <u>forfeited</u> if:

> the Participant <u>solicits</u>, directly or indirectly, any company or entity who was a <u>customer or client of [Deutsche Bank]</u> at any time prior to the Vesting Date in order to provide (directly or indirectly) to such company or individual services similar to, competitive with, or intended to replace or serve as an alternative to, any or all of the services provided to such company or individual by [Deutsche Bank].

Cp., Exhibit C, §5.1(d) (emphasis added).

On March 16, 2004, Deutsche Bank terminated Davidson's employment.  Cp., ¶9. Deutsche Bank offered Davidson a severance package that provided for payment of 12 weeks of Davidson's base salary.  Cp., Exhibit E.  Deutsche Bank also offered Davidson the right to continue vesting his REU Awards after termination, which Deutsche Bank stated would be "subject to the [REU] Plan Rules (including the continuing provisions of Section 5.1 [relating to forfeiture]) until the vesting date."  Cp., ¶11, and Exhibit E.[3] Davidson refused to execute the severance letter.  Cp., ¶11.  On or about May 11, 2004, Davidson filed a Complaint against defendants asserting the following five counts, each of which fails as a matter of law:

<u>Count 1</u>:  Plaintiff asserts that Deutsche Bank violated the Massachusetts Weekly Wage Act, M.G.L. c. 149, §149, by not paying him some unspecified portion of a discretionary incentive bonus for 2004 that plaintiff claims he would have received had he remained employed.  Count 1 should be dismissed because a <u>contingent bonus</u> such as this <u>does not fall within the protections of the Wage Act</u>.

---

[3]    Although the REU Plan expressly allowed Deutsche Bank to terminate the vesting of all of Davidson's unvested REU Awards when it terminated him, Deutsche Bank instead offered to allow Davidson to continue vesting his REUs, subject to the conditions in the REU Plan, and subject to Davidson's execution of a release.  *See* Cp., Exhibit C, at page 5 and at §6.2 (page 15).

4

Count 2:  Plaintiff claims that Deutsche Bank breached a purported agreement in his Employment Letter to pay Davidson his incentive compensation for 2004 if he was discharged without "Cause."  Count 2 should be dismissed because the plain and unambiguous terms of the Employment Letter establish as a matter of law that Deutsche Bank made no such agreement.

Count 3:  Plaintiff asserts that he is entitled to recover some unspecified portion of the discretionary incentive bonus he claims he might have been granted for 2004, under the doctrine of *Gram v. Liberty Mutual Insurance,* 384 Mass. 659, 429 N.E.2d 21 (1981). Count 3 should be dismissed because *Gram* does not allow the recovery of such unascertainable, contingent, future compensation that is not clearly related to an employee's past services.

Count 4:  Plaintiff asserts that defendants violated ERISA §510 (29 U.S.C. §1140) by allegedly "timing" plaintiff's termination for the purpose of depriving him of the right to be "considered" for a special contingent severance payment in an unspecified amount. Count 4 should be dismissed because plaintiff has failed to plead a viable claim under §510.

Count 5:  Plaintiff asks the Court to declare that he has the right to continue vesting his REUs even if he solicits Deutsche Bank's customers in direct violation of the terms of the governing REU Plan.  Count 5 should be dismissed because Massachusetts law expressly allows the forfeiture of an employee's unvested rights, such as plaintiff's unvested REU Awards, for such a violation.

## ARGUMENT

I.   **PLAINTIFF'S CLAIM UNDER THE MASSACHUSETTS WEEKLY WAGE ACT SHOULD BE DISMISSED BECAUSE POTENTIAL FUTURE COMPENSATION, SUCH AS THE CONTINGENT INCENTIVE BONUS FOR WHICH PLAINTIFF SUES, DOES NOT FALL WITHIN THE SCOPE OF THE ACT.**

The Massachusetts Weekly Wage Act (the "Wage Act") requires employers to pay their employees promptly at weekly or bi-weekly intervals.  M.G.L. c. 149, §148. "The statute was intended and designed to protect wage earners from the long-term detention of their wages by unscrupulous employers, as well as to protect society from irresponsible employees who receive and spend lump sum wages."  *Cumpata v. Blue Cross Blue Shield of Massachusetts, Inc.*, 113 F. Supp. 2d 164, 167 (D. Mass. 2000). Massachusetts courts have construed the Wage Act "narrowly."  *Prozinski v. Northeast Real Estate Services, LLC*, 59 Mass. App. Ct. 599, 603, 797 N.E.2d 415, 419 (2003).

Davidson claims that Deutsche Bank violated M.G.L. c. 149, §148, of the Wage Act, which provides that "any employee discharged from employment shall be paid in full on the day of his discharge."  Davidson does <u>not</u> claim that Deutsche Bank failed to pay him any salary, any vacation pay, sick leave, or accrued commissions that were owing when he left Deutsche Bank.  Instead, Davidson asserts that Deutsche Bank violated the Wage Act when it terminated him on March 16, 2004, because it did not pay him some unspecified amount of an undetermined and conditional incentive bonus that he claims he might have received later in that year had he remained employed.  Cp., ¶17, and Exhibit A.  This claim should be dismissed because a discretionary and contingent future incentive bonus such as this does not fall within the scope of the Wage Act, as a matter of law.

6

It is well established that the Wage Act "applies only to 'wages' and not to all forms of earned compensation." *Boston Police Patrolmen's Ass'n, Inc. v. City of Boston*, No. 96-6222E (Mass. Super. Ct. Nov. 16, 1999) (1999 WL 1260164 at *8), *aff'd*, 435 Mass. 718, 761 N.E.2d 479 (2002). "Wages," within the meaning of the Wage Act, "are money to which the employee has an <u>absolute right</u>; it is his property … <u>not subject to any limitations, contingency, or delay</u>' in payment." *Huebsch v. Katahdin Industries, Inc.*, No. CA004483 (Mass. Super. Ct. Apr. 24, 2001) (2001 WL 716884 at *2), *quoting Boston Police Patrolmen's Ass'n,* 1999 WL 1260164 at *5 (emphasis added). Case law interpreting the Wage Act, including a decision by this Court, makes very clear that the Wage Act does not cover a potential, <u>contingent</u> bonus such as the future incentive compensation for which Davidson sues.

In *Baptista v. Abbey Healthcare Group, Inc*., No. 95-10125-RGS (D. Mass. April 10, 1996) (1996 WL 33340740) (Stearns, J.), this Court ruled that there is "no reason to extend the protections of a wage earner's statute to cover <u>bonuses potentially owing</u> to highly paid executives…." *Id.* at *4 (emphasis added). This Court relied in part on *Massachusetts v. Morash*, 490 U.S. 107, 117 (1989), in which the Supreme Court drew a distinction, for purposes of application of the Wage Act, between "ordinary wages and wage equivalents, specifically accrued vacation pay and sick leave," on the one hand, and "benefits triggered by <u>contingencies</u>," such as bonuses, on the other. *Id.* (emphasis added). In *Baptista,* this Court held that this "distinction between <u>assured and contingent compensation</u> is a sound one" for purposes of the Wage Act, and granted the defendant's motion to dismiss the plaintiff's Wage Act claim for contingent compensation. *Id*. (emphasis added). Many federal and Massachusetts state courts have relied upon this

Court's rationale in *Baptista* and have similarly concluded that contingent or irregular compensation to employees, as opposed to assured and regular compensation, does not constitute "wages" under the Wage Act.  *See, e.g.*, *Cumpata,* 113 F. Supp. 2d at 168 (commissions above and beyond a senior sales executive's base salary that were calculated quarterly and annually based upon exceeding sales quotas and company profitability fell outside scope of the Wage Act in part because such compensation is "triggered by contingencies").[4]

These precedents establish that the potential, non-guaranteed incentive bonus for which Davidson sues does not constitute part of his "wages" within the meaning of the Wage Act.  Davidson's Employment Letter provided that any incentive bonus would be above and beyond Davidson's base salary, and would also be "contingent" upon several factors, namely "the profitability of Deutsche Bank's operations, the performance of [Davidson's] division, and [Davidson's] individual contribution."  Cp., Exhibit A.  Given that Davidson was terminated on March 16, 2004 (only two and one-half months into the year), there was no way to determine at that time -- even in the most speculative of terms – any of the factors that would inform a decision about his incentive pay, including what Deutsche Bank's profitability would be at year-end, how Davidson's division would perform, or what Davidson's contribution would be to either factor.  Indeed, even if Davidson had remained employed at Deutsche Bank for the entirety of 2004, there is no

---

[4]     *See also Okerman v. VA Software Corporation,* No. 001825 (Mass. Super. Ct. July 9, 2003) (2003 WL 21960599) (potential commissions fall outside the Wage Act where they are above and beyond employee's base salary, contingent upon certain sales goals being reached, and not definitely determined); *Locke v. Sales Consultants of Boston, Inc.,* No. CA 984081 (Mass. Super. Ct. Apr. 13, 2001) (2001 WL 716911) (compensation that was paid quarterly rather than weekly and that was triggered by numerous contingencies fell outside Wage Act); *Huebsch, supra,* 2001 WL 716884 at *3 (potential compensation that was subject to a contingency that had not been satisfied was not covered by the Wage Act); *Dennis v. Jager, Smith & Stetler, P.C.,* No. 984974G (Mass. Super. Ct. Apr. 10, 2000) (2000 WL 782946 at *1) (contract attorney's right to draw from defendant law firm was neither wage nor commission under the Wage Act because it "was contingent on a number of factors").

assurance that Davidson would have received <u>any</u> incentive bonus for that year, and obviously no way to determine how much.

Because Davidson's demand for the payment of some portion of an undetermined and contingent incentive bonus as a matter of law does not constitute a demand for assured compensation within the scope of the Wage Act, Count 1 of his Complaint should be dismissed.

## II.    <u>PLAINTIFF AS A MATTER OF LAW HAD NO CONTRACTUAL RIGHT TO RECEIVE INCENTIVE COMPENSATION IN 2004.</u>

As an alternative to the Wage Act claim, Count 2 seeks an award of incentive compensation for 2004 on a contract theory.  Plaintiff contends that, "under the terms of the agreement established … under the Employment Letter," Deutsche Bank "is obligated to pay Davidson his [2004] incentive compensation unless he is terminated before the end of the year and such termination is for 'Cause.'"  Cp., ¶21.  Davidson's claim must fail because nothing in the Employment Letter purports to impose any obligation on Deutsche Bank to pay Davidson any amount of incentive compensation for 2004.

The Employment Letter addresses "Incentive Compensation" in a section consisting of three paragraphs.  The first paragraph provides generally that plaintiff will be "eligible to participate in the Deutsche Bank incentive pool in an amount contingent upon the profitability of Deutsche Bank's operations, the performance of your division, and your individual contribution."  The second and third paragraphs provide for a "Guaranteed Incentive Bonus," but <u>only for the year ending 2001</u>.  *See* Cp., Exhibit A (defining "Guaranteed Incentive Bonus" as "a minimum guaranteed bonus award of not less than $875,000.00 (less statutory withholdings) <u>for the year ending December 31, 2001</u>") (emphasis added).  Nothing in the Employment Letter (or anywhere else) purports

9

to promise or guarantee plaintiff any bonus at all, in any amount, for any year other than the year ending December 31, 2001.

There is no merit in plaintiff's allegation that he is entitled to his incentive bonus because he was not terminated for cause. Cp., ¶22. In making this argument, he evidently relies on the third paragraph of the Employment Letter, which provides as follows:

> The cash portion of the <u>Guaranteed Incentive Bonus</u> is payable no later than the end of March 2002 provided that no notice of termination has been given by you prior to the date of payment, and provided that your <u>employment has not terminated for "Cause</u>" (as defined in Appendix A).

Cp., Exhibit A (emphasis added).[5] Plaintiff's reliance on this provision is entirely misplaced because the provision by its terms applies <u>only</u> to the payment of Davidson's "Guaranteed Incentive Bonus," which is defined as his "minimum guaranteed incentive bonus award…<u>for the year ending December 31, 2001</u>." Cp., Exhibit A (emphasis added). That this provision is limited to plaintiff's incentive compensation for <u>2001</u> is further evident in the fact that the provision requires payment of the "Guaranteed Incentive Bonus" <u>by March 2002</u>.

"'Under Massachusetts law, interpretation of a contract is ordinarily a question of law for the Court.'" *Coll v. PB Diagnostic Systems, Inc.*, 50 F.3d 1115, 1122 (1st Cir. 1995), *quoting Clarendon Trust v. Dwek*, 970 F.2d 990, 993 (1st Cir. 1992). Because the plain and unambiguous terms of the Employment Letter establish as a matter of law that plaintiff was an at-will employee who could be terminated at any time and that Deutsche

---

[5]     <u>No</u> provision of the Employment Letter supports, even remotely, Davidson's contention that Deutsche Bank was contractually obliged to pay incentive compensation to him under certain circumstances if he was "terminated before year end." Cp., ¶21.

Bank undertook no obligation to pay the plaintiff any amount of incentive compensation for 2004 under any circumstances, plaintiff's contract claim should be dismissed.

### III. PLAINTIFF AS A MATTER OF LAW HAS NO RIGHT TO A PRO-RATED INCENTIVE BONUS FOR 2004 UNDER *GRAM V. LIBERTY MUTUAL*.

Count 3 of the Complaint contends that, under *Gram v. Liberty Mutual Insurance Company*, 384 Mass. 659, 672, 429 N.E.2d 21, 29 (1981) ("*Gram*"), plaintiff is entitled to payment of some portion of his potential 2004 incentive bonus because "his employment was terminated without 'Cause' and such compensation relates to his past services (nearly one fully [sic] calendar quarter's worth)." Cp., ¶25 (emphasis added).  Contrary to plaintiff's assertion, plaintiff has no right under *Gram* or any other principle of Massachusetts law to recover any portion of an undefined, discretionary, and contingent incentive bonus.

*Gram* involved a claim by a terminated insurance sales representative who sought payment of future "percentage commissions" attributable to the renewal of insurance policies that he had sold during the course of his employment.  The parties did not dispute that, if Gram had continued to work as a sales representative, he would have had "the right to renewal commissions" for those policies.  429 N.E.2d at 30 (emphasis added).  The Supreme Judicial Court held that Gram could recover "reasonably ascertainable" future renewal commissions for the policies plaintiff had sold, because those commissions were "clearly related" to the employee's past services and reflected the "agreed worth" of those services.  *Gram*, 429 N.E.2d at 29.  The SJC emphasized that its decision in *Gram* to allow a terminated employee to recover agreed-upon future renewal commissions for past services "will not have wide implications" because, in most other employment arrangements, "the loss to the employee derived from an

11

employee's loss of compensation for past service <u>cannot be as clearly defined</u>."  429 N.E.2d at 29 n.10 (emphasis added).  Therefore, as a threshold matter, recovery under a *Gram* theory requires a showing that the termination deprived the employee of "<u>measurable</u> compensation <u>based upon past services</u>."  *Hunt v. Wyle Laboratories, Inc.*, 997 F. Supp. 84, 90-91 (D. Mass. 1997) (emphasis added).  *See also Coll,* 50 F.3d at 1125 (affirming trial court's dismissal of plaintiff's claim for potential incentive compensation under *Gram* because plaintiff failed to show that his termination had deprived him of any <u>particular benefit</u> to which he was entitled for past services).

In *Gram v. Liberty Mutual Ins. Co.,* 391 Mass. 333, 334-36, 461 N.E.2d 796, 797-98 (1984) (*Gram II*), the Supreme Judicial Court reiterated that recovery under the *Gram* theory is limited to "identifiable future benefit[s] … reflective of past services," and does not include future benefits that are speculative.  Thus, in *Gram II* the Court denied the plaintiff recovery for "career credits," which were bonus payments based on length of service, and not linked to particular past services.  The Court also denied the plaintiff recovery for future indorsements of changes on the insurance policies that plaintiff had sold, on the ground that future policy changes, as well as the future premium levels that would determine the salesman's commission on such indorsements, were "speculative."  461 N.E.2d at 799.  *See also Harrison v. NetCentric Corp.,* 433 Mass. 465, 475, 744 N.E.2d 622, 631 (2001) ("speculative interests" are "neither 'clearly identifiable' … nor 'clearly related to an employee's past services,'" and therefore not recoverable under *Gram*); *Sands v. Ridefilm Corp.,* 212 F.3d 657, 663 (1st Cir. 2000) (terminated employee "may not recover damages for future, prospective benefits not earned by past services").

Here, Davidson's attempt to recover two and one-half months' worth of an undetermined and contingent annual "incentive bonus" that he might have received had he remained employed throughout 2004 falls well outside the narrow theory of recovery created by *Gram*. As Davidson's Employment Letter states, his eligibility to participate in Deutsche Bank's incentive pool was "contingent upon the profitability of Deutsche Bank's operations, the performance of [Davidson's] division, and [his] individual contribution." Cp., Exhibit A (emphasis added). As such, whether Davidson would receive any incentive bonus for 2004 at all, even if he had continued his employment, as well as the amount of any such bonus, rested solely within the discretion of Deutsche Bank. Just as significantly, the determination of whether to make any award, as well as its amount, depended on an entirely subjective assessment of factors that were unknown at the time of plaintiff's termination, such as how Davidson would perform during the bulk of the year still ahead, the success of his division in 2004, the degree to which he would "contribute" to the future performance of his division for the year, and the overall "profitability" that Deutsche Bank would be able to achieve in 2004. Moreover, wholly apart from its inherently subjective nature and its reliance on speculative factors that would remain unknown until some future date, the bonus by its terms was dependent on a number of factors other than plaintiff's own performance, and thus cannot be deemed to be either "closely related" to his past services or reflective of the "agreed worth" of any of his services.

In short, because plaintiff's potential incentive bonus for 2004 was speculative, not reasonably ascertainable at the time of his termination, and not clearly related to or reflective of the agreed worth of any past services by the plaintiff, it does not fall within

the narrow window of recovery allowed by *Gram*. Count 3 should therefore be dismissed for failure to state a claim.

## IV.    **PLAINTIFF FAILS TO STATE A CLAIM UNDER ERISA.**

In Count 4 of the Complaint, plaintiff purports to assert a claim under 29 U.S.C. §1140 (ERISA §510), which provides in pertinent part:

> It shall be unlawful for any person to discharge … a participant … for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan…."

29 U.S.C. §1140. Plaintiff alleges that Deutsche Bank violated §1140 because the "timing" of his termination "was made for the purpose of interfering with his attainment of his right" to receive a "Special Payment" under Deutsche Bank's "Severance Plan." Cp., ¶¶29, 31. Specifically, plaintiff alleges that, under Deutsche Bank's Severance Plan, he "would have been eligible to receive [a Special Payment] equal to up to 50% of his 2003 incentive compensation award had his discharge occurred on or after April 1, 2004," rather than on March 16. Cp., ¶29. Contrary to plaintiff's assertion, the language of the Severance Plan on which he relies actually provides as follows:

> b.    Special Incremental Severance Payment ("Special Payment")
>
> • Plan Participants whose Termination Date is on or after April 1, but before the date Incentive Compensation is next paid (the "Incentive Compensation Payment Date") will be <u>considered</u> by the Bank for a Special Payment that <u>may</u> be <u>up to</u> an amount equal to 50% of the Incentive Compensation most recently paid to the Plan Participant.
>
> • A Plan Participant whose Termination is on or after the Incentive Compensation Payment Date, but before April 1 of that year, will not be considered for, or entitled to, a Special Payment.

Cp. ¶10 and Exhibit D (emphasis added).

Count 4 should be dismissed because plaintiff has failed to plead a viable claim under 29 U.S.C. §1140.

> **A.**    **Section 1140 Does Not Impose Liability on an Employer for an Incidental Loss of Benefits Resulting from a Lawful Termination, Such as the Loss Plaintiff Claims from the "Timing" of His Termination.**

Section 1140 by its terms imposes liability on an employer who <u>discharges</u> an employee "for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan…."  29 U.S.C. §1140.  Plaintiff does not, and cannot, allege that he was <u>discharged</u> from his position at Deutsche Bank for the purpose of interfering with his right to a Special Payment.  Instead, he alleges that the "<u>timing</u>" of his termination "was made for the purpose of interfering with his attainment of his right" to receive a Special Payment.  Cp., ¶31 (emphasis added).  Nothing in §1140, however, suggests that a discharge that is otherwise lawful and proper may be held to violate §1140 merely because its timing allegedly results in incidental losses of the plaintiff's benefits.

To the contrary, the First Circuit, like many other courts, has recognized that a merely incidental loss of benefits – as by the timing of termination – is not actionable under §1140.  As the Court stated in *Lehman v. Prudential Ins. Co. of America*, 74 F.3d 323, 330-31 (1st Cir. 1996):

> "<u>ERISA provides no relief if the loss of an employee's benefits was incidental to, and not the reason for, the adverse employment action</u>.  Were this not so, every discharged employee who had been a member of a benefit plan would have a potential cause of action against his or her former employer under ERISA."

(Emphasis added.)  *See also Dewitt v. Penn-Del Directory Corp.,* 106 F.3d 514, 523 n.9, 524 (3rd Cir. 1997) ("the mere fact that [plaintiff] was terminated near the end of the

year," and two weeks prior to the year-end date on which her pension benefits would have received a higher valuation, is "insufficient to support a … claim" under §1140; "[b]ecause [the plaintiff in *Dewitt*] was an at-will employee, her employer could terminate her employment, for any reason and <u>on any date the employer chose</u>") (emphasis added); *Blessing v. J.P. Morgan Chase & Co.,* No. 02 Civ. 3874 (LMM) (2003 WL 470338 at *3) (S.D.N.Y. Feb. 24, 2003) (dismissing plaintiff's §1140 ERISA claim where plaintiff did not allege that he was terminated in order to avoid paying him severance).  Thus, because plaintiff has failed to plead even the most basic element of a §510 claim, namely, that he was discharged for the purpose of interfering with his purported right to a Special Payment, Count 4 fails to state a claim and should be dismissed.

## B.    Plaintiff's Allegations Establish that He Had No "Right" to a Special Payment.

Plaintiff's §1140 claim should be dismissed for the further reason that he has failed to allege facts suggesting that his discharge interfered with any "right" to which he was entitled.  Although plaintiff alleges that the "timing" of his discharge interfered with his "right to receive [a Special Payment]," the plain and unambiguous language of the Severance Plan establishes as a matter of law that he had no "right" to any such payment. Cp., ¶31.  As the Severance Plan states, if plaintiff had been terminated on April 1, rather than March 16, he would have been eligible only to be "considered" by the Bank for a Special Payment.  Cp., Exhibit D (at Appendix).  The word "considered," which means "think about," does not reasonably suggest <u>entitlement</u> to any payment at all, much less to the payment of any particular amount.  *See* New World Dictionary of the American Language at 303 (2d Coll. ed. 1974).  The wholly speculative value in eligibility to be

"considered," or thought about, for a Special Payment is further evident in the fact that the Severance Plan does not set forth any factors that the Bank must apply in "considering" whether to make a Special Payment. Additionally, the fact that the Plan provides that a "Special Payment … may be up to an amount equal to 50% of the Incentive Compensation most recently to the Plan Participant" underscores the fact that Deutsche Bank is not obligated to make any payment at all, and that plaintiff therefore had no "right" to any such payment, within the meaning of the statute.

As the court held in *Herring v. Oak Park Bank*, 963 F. Supp. 1558, 1570 (D. Kan. 1997), where the plaintiff had bargained for and received an underlined unfunded deferred compensation plan, the employer as a matter of law did not violate §1140 even if it terminated the plaintiff for the purpose of avoiding an imminent federal requirement to fund the plan. The court explained that "the bank's refusal to fund the plan cannot have interfered with any rights of plaintiff under the Agreement as bargained for," because the plaintiff had no right under his Agreement to a funded plan. *Id.* (emphasis added). For this reason, even assuming that the bank in *Herring* had terminated the plaintiff to avoid funding the plan, the court held that no reasonable jury could conclude from such a fact that the bank had acted with the specific intent of depriving the plaintiff of any "right" to which he was entitled, within the meaning of §1140. *Id. See also McGann v. H & H Music Company*, 946 F.2d 401, 405 (5th Cir. 1991) ("[t]he right referred to in the second clause of section 510 [29 U.S.C. §1140] is not simply any right to which an employee may conceivably become entitled, but rather any right to which an employee may become entitled pursuant to an existing, enforceable obligation assumed by the employer") (emphasis added). Because the plain and unambiguous terms of the Severance Plan here

establish as a matter of law that plaintiff had no enforceable "right" to a Special Payment,

plaintiff has failed to allege a viable claim under 29 U.S.C. §1140.

### C. Plaintiff's Allegations Fail to Support a Reasonable Inference that Deutsche Bank Terminated Him to Deprive Him of a Special Payment.

Plaintiff's ERISA claim should be dismissed for yet another reason:  he has failed

to allege facts that could support a reasonable inference that Deutsche Bank acted with

the intent of depriving him of a Special Payment.  As the First Circuit has recognized, a

§1140 plaintiff must show that his employer "was motivated by 'the specific intent of

interfering with the employee's ERISA benefits.'"  *Lehman,* 74 F.3d at 330 (emphasis

added).  A plaintiff must therefore show a causal connection between his discharge and

the intent to deprive him of the benefit.  *See Dewitt*, 106 F.3d at 523 ("the employee must

show that the employer made a conscious decision to interfere with the employee's

attainment of pension eligibility or additional benefits").  As the Court explained in

*Conkwright v. Westinghouse Electric Corp.,* 933 F.2d 231, 239 (4th Cir. 1991), "ERISA

does not guarantee every employee a job until he or she has fully vested into a company's

benefit plan," but merely "guarantees that no employee will be terminated where the

purpose of discharge is the interference with one's pension rights."  (Emphasis added.)

Accordingly, the court held, "it is not sufficient for an employee to allege lost opportunity

to accrue additional benefits," and a plaintiff must instead "adduce facts, which if taken

as true, could enable a jury to identify unlawful intent from the other various reasons why

an employer might have terminated plaintiff, and to conclude that the employer harbored the requisite unlawful intent."[6] *Id.*

Where, on the facts alleged by the plaintiff, it is not reasonable to infer that the employer was motivated by the desire to deprive the plaintiff of benefits, plaintiff cannot establish such a causal connection, and thus cannot maintain such a claim. In *Dewitt*, for example, the court rejected plaintiff's §1140 claim as a matter of law where the potential savings to the employer from terminating the plaintiff were not "of sufficient size that they may be realistically viewed as a motivating factor" in plaintiff's termination. 106 F.3d at 523. Similarly in *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1224 (11th Cir. 1992), plaintiff's §1140 claim was rejected where his employer did not obtain substantial savings in benefit expenses from terminating him. *See also Herring*, 963 F. Supp. at 1570 (where it would have been cheaper for bank in short term to retain plaintiff than to terminate him, plaintiff could not establish that he was terminated with specific intent of depriving him of his benefits); *Daughtrey v. Honeywell, Inc.*, 3 F.3d 1488, 1491 (11th Cir. 1993) (plaintiff could not establish §510 claim where she could not show that employer reduced its outlays for pension benefits by terminating her); *Campbell v. Bankboston*, 206 F. Supp. 2d 70, 80-81 (D. Mass. 2002) (rejecting ERISA §510 claim where there was no evidence that the employer had excluded the plaintiff from early retirement plan with a "specific intent" to interfere with his benefits).

---

[6]      *See also Rogic v. Mallinckrodt Medical, Inc.*, 917 F. Supp. 671, 680-81 (E.D. Mo. 1996) (plaintiff failed to state claim under ERISA by alleging that he was terminated two years before he would have reached age 65, when his pension benefits would have increased; plaintiff must show a "causal connection between his discharge and the attainment of retirement benefits"); *Fleming v. Borden, Inc.*, 829 F. Supp. 160, 162-63 (D.S.C. 1992), *aff'd*, 996 F.2d 1210 (4th Cir. 1993) (unpublished opinion) (fact that employer might save money by discharging plaintiff before she qualified for disability benefits was not enough in itself to supply causal connection between discharge and intent to deprive plaintiff of benefits; "[i]f that were true, any actions by an employer that resulted in cost savings would be evidence of discrimination").

Although plaintiff is entitled to the benefit of all <u>reasonable</u> inferences that may be drawn from the facts he has alleged, he is not entitled to the benefit of <u>unreasonable</u> inferences. *See, e.g., Bertera Chrysler Plymouth, Inc. v. Chrysler Corp.,* 992 F. Supp. 64, 66 (D. Mass. 1998) (on motion to dismiss, court need not consider "unsupported allegations, unreasonable inferences, and conclusory speculation"); *Ticketmaster-New York, Inc. v. Alioto,* 26 F.3d 201, 203 (1st Cir. 1994) (court does not "credit conclusory allegations or draw farfetched inferences" on a motion to dismiss). Here, although plaintiff conclusorily alleges that the "timing" of his discharge "was made for the purpose of interfering with his attainment of his right" to receive a possible "Special Payment" under Deutsche Bank's "Severance Plan," plaintiff's own allegations, including the undisputed terms of the Severance Plan, preclude any reasonable inference that Deutsche Bank had any intent to deprive him of a Special Payment by terminating him on March 16 instead of April 1. Cp., ¶¶29, 31, and Exhibit D. As discussed above, plaintiff's own allegations establish that Deutsche Bank would have had no obligation to make a Special Payment to plaintiff even if he had been terminated on or after April 1, and that Deutsche Bank therefore obtained no benefit at all by terminating him on March 16 rather than April 1. Because there is no basis for any reasonable inference that Deutsche Bank would have been required to pay the plaintiff any amount at all, much less any amount so large as to suggest a motivating factor, if it had terminated plaintiff on April 1, rather than on March 16, plaintiff has failed to allege any facts that could suggest a causal connection between his termination (or even its "timing") and his severance pay. Count 4 should therefore be dismissed for this reason as well.

**V.    THE DECLARATORY JUDGMENT PLAINTIFF SEEKS IN COUNT 5 SHOULD BE DENIED BECAUSE MASSACHUSETTS LAW ENFORCES FORFEITURES OF AN EMPLOYEE'S UNVESTED BENEFITS, SUCH AS PLAINTIFF'S UNVESTED EQUITY UNITS.**

In Count 5, plaintiff asks the Court to declare that he may continue vesting his restricted equity units, or REUs, in Deutsche Bank AG, if he solicits Deutsche Bank's customers.  Contrary to plaintiff's assertion, nothing in Massachusetts law supports his claim that his unvested equity shares may not be forfeited if he violates the terms of the REU Plan by soliciting Deutsche Bank's customers.

Plaintiff acknowledges, as he must, that the restricted equity units (REUs) that he received in Deutsche Bank AG are subject to the terms of the REU Plan.  Cp., ¶8, and Exhibits B and C.  The REU Plan provides that the REUs that are granted to the plaintiff will vest over a period of time, in accordance with the schedule stated on the award statement for each REU.  Cp., Exhibit C at page 6 and §§2.1, 4.1, 4.5(b); *see also* Cp., Exhibit B, at page 1 ("Vesting and Restrictions") (REUs granted in 2003 will vest in full in August 2007).  The REU Plan states that the REUs "are awarded to selected individuals in <u>anticipation</u> of <u>ongoing</u> contribution to the success of the organization, and <u>to align the interests</u> of employees and Deutsche Bank shareholders."  Cp., Exhibit B (at "Overview, Award Granted in February 2003") (emphasis added).  The REU Plan provides that any unvested REU awards will be subject to forfeiture if an employee is terminated for cause.  Cp., Exhibit C, §5.1(a) (page 13).  The Plan also provides that an employee's unvested shares will be forfeited if the employee engages in certain types of conduct after termination.  Among other things, the plan expressly provides that unvested awards will be "automatic[ally] forfeited" if the employee "<u>solicit[s</u>] Deutsche Bank

21

<u>clients</u> with the effect or intention of diverting business from Deutsche Bank." Cp.,

Exhibit B ("Forfeiture and Vesting") (emphasis added); Cp., Exhibit C, §5.1(d).

Plaintiff indicates that he intends to solicit Deutsche Bank's customers, in

violation of the non-solicitation provision in the REU Plan. Cp., ¶35. He asks the Court

to declare that the unvested portions of his REUs constitute "deferred compensation"

which may not be forfeited by such solicitation, relying on *Kroeger v. Stop & Shop*

*Companies, Inc.,* 13 Mass. App. Ct. 310, 432 N.E.2d 566 (1982). Cp., ¶36. Plaintiff is

demonstrably wrong, however, and nothing in *Kroeger*, or any other Massachusetts case,

supports his position. To be sure, *Kroeger* held that "deferred compensation" that an

employee had <u>earned</u> by his past services could not be forfeited due to a non-compete

provision. 432 N.E.2d at 572. In *Kroeger*, however, the court made clear that future

compensation that has <u>not yet vested</u> at the time of an employee's termination, and that

has therefore not been earned, may indeed be forfeited if the employee violates a non-

compete provision. The deferred compensation at issue in *Kroeger* consisted of a

retirement plan to which the employee, who was 48 years old when the plan was created,

would be entitled at age 65 (17 years later). 432 N.E.2d at 572-73. The employee

worked for Stop & Shop for 10 years before he was terminated, at the age of 58. *Id.* at

572. The court held that, as of his termination, the employee had earned ten-seventeenths

of his retirement benefits (10 years of employment out of the 17 total years he had to

work, from age 48 to 65, to obtain full vesting), and that these earned, or vested, benefits

could not be forfeited by competition. *Id.* at 572-73 (plaintiff entitled to recover the ten-

seventeenths of his retirement benefits that he had earned as of his termination;

"employee's deferred compensation benefits should not be forfeited <u>to the extent those</u>

benefits are earned") (emphasis added). However, the court expressly held that the remaining seven-seventeenths of the benefits, which the employee had not yet earned, and which had not vested, were forfeited by his violation of the non-compete provision. *Id.* at 573 (plaintiff "loses $29,235 [seven-seventeenths of his retirement benefits] without [his employer] having established specific pecuniary damages" by reason of plaintiff's violation of non-competition provision, and thus forfeits unvested portion of his benefits as liquidated damages for competing).

The Supreme Judicial Court has made it clear that incremental amounts of equity interests that are granted to employees as part of their compensation, and that are to vest under a vesting schedule that extends beyond the employee's termination date, are not compensation that an employee has earned as of his termination, and that such unvested interests may therefore be forfeited if the employee is terminated, even if the termination is without cause. *See Harrison,* 744 N.E.2d at 473-74 (where employee's stock options vested over time only if he continued to be employed, the unvested shares were not compensation for past services, and plaintiff had no right to continued vesting); *Cochran v. Quest Software, Inc.,* 328 F.3d 1, 8 (1st Cir. 2003) (unvested portions of employee's stock options were not deferred compensation for services already performed).

Here, plaintiff's own allegations, including the documents he has attached to the Complaint, establish as a matter of law that, under controlling Massachusetts precedents, the REUs that had not yet vested as of the date of plaintiff's termination were not deferred compensation that plaintiff had earned for his past services, and they may be forfeited, as the REU Plan provides, if plaintiff solicits Deutsche Bank's customers during the vesting period. Not only the vesting schedule itself, but also the undisputed

terms of the REU Plan, show that the vesting of incremental REUs was intended both to compensate for <u>future</u> services and to ensure that the plaintiff did not act to harm Deutsche Bank's interests during the vesting period <u>in the future</u>.  Namely, the REU Plan provided that REUs are awarded "in <u>anticipation</u> of <u>ongoing</u> contribution to the success of the organization, and <u>to align the interests</u> of employees and Deutsche Bank shareholders."  Cp., Exhibit B ("Overview, Award Granted in February 2003") (emphasis added).  Under the REU Plan, Deutsche Bank expressly reserved the right to forfeit all of an employee's unvested shares on his termination, even if the employee was terminated without cause.  Cp., Exhibit C, at page 5 and at §6.2 (page 15).  The REU Plan also provided that, if Deutsche Bank should exercise its discretion to allow the terminated employee to continue vesting shares after termination (as Deutsche Bank offered to do for the plaintiff in exchange for a release that plaintiff never gave), the continued vesting would be subject to the employee's compliance with the conditions in the REU Plan, including not soliciting Deutsche Bank's customers during the vesting period.  Cp., Exhibit C, §5.1.  As the Court stated in *Harrison*, "[the employee's] shares vested over time only if he continued to be employed; thus, the unvested shares are not earned compensation for past services, but compensation contingent on his continued employment."  433 Mass. at 473, 744 N.E.2d at 630.  Similarly here, the fact that Davidson's shares continued to vest only if he continued to be employed and/or did not contravene Deutsche Bank's interests during the vesting period establishes that the unvested shares are compensation for future, not past services.

     In short, the terms of the REU Plan, as well as controlling precedents, establish that plaintiff had not earned the unvested REUs at the time of his termination, and that

those unvested portions are not deferred compensation for past services.  Under

Massachusetts law, those unvested REUs may, and will, be forfeited if plaintiff solicits

Deutsche Bank's customers during the vesting period.  Because plaintiff as a matter of

law has no right to the declaration by which he seeks to avoid forfeiture of his unvested

REUs, Count 5 should be dismissed.

## **<u>CONCLUSION</u>**

For the reasons discussed above, the Complaint fails to state any claim on which

relief may be granted, and it should be dismissed in its entirety.

> DEUTSCHE BANK SECURITIES, INC.,
> DEUTSCHE BANK AMERICAS HOLDING
> CORPORATION, AND DEUTSCHE
> BANK AMERICAS SEVERANCE PAY
> PLAN,
>
> By their attorneys,
>
> /s/      Scott A. Roberts
> Scott A. Roberts, BBO##550732
> sroberts@resq.com
> A. Lauren Carpenter, BBO#551258
> lcarpenter@resq.com
> SULLIVAN, WEINSTEIN & McQUAY, P.C.
> Two Park Plaza
> Boston, MA 02116

Dated:  June 30, 2004                617-348-4300

## <u>LOCAL RULE 7.1(a)(2) CERTIFICATE OF CONFERENCE</u>

Pursuant to Local Rule 7.1(a)(2), I, Scott A. Roberts, counsel to the defendants,

certify I have conferred with the plaintiff's counsel and have attempted to in good faith to

resolve or narrow the issues presented by the Defendants' Motion to Dismiss.

 /s/ Scott A. Roberts
Scott A. Roberts (BBO#550732)
