## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHRISTOPHER C. DAVIDSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| | ) |
| DEUTSCHE BANK SECURITIES, INC., | ) Civil Action No. 1:04-cv-11027-RGS |
| DEUTSCHE BANK AMERICAS | ) |
| HOLDING CORPORATION, | ) |
| and DEUTSCHE BANK AMERICAS | ) |
| SEVERANCE PAY PLAN | ) |
| | ) |
| Defendants. | ) |
| | ) |

### PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
### ALL COUNTS AND MEMORANDUM IN SUPPORT THEREOF

NOW COMES the Plaintiff, Christopher C. Davidson ("Davidson"), pursuant to Fed. R.

Civ. P. 12(b)(6), who hereby opposes defendants' Motion to Dismiss All Counts, and

respectfully requests that this Court deny defendants' motion in its entirety, for the reasons set

forth below.

### INTRODUCTION

Christopher Davidson, age 32, worked for Deutsche Bank for over three years as a

salesman of European equities to large financial institutions located in the Boston area.

Complaint, ¶ 5. The terms of Davidson's employment were established under a certain letter

agreement dated February 7, 2001 a copy of which is attached the Complaint as Exhibit A (the

"Employment Letter"). Each year Davidson received a base salary of $125,000 and incentive

compensation in an amount equal to or above this base salary.   Complaint, ¶¶ 5-9. Davidson's

employment was terminated by Deutsche Bank on March 16, 2004 without "cause." Id. at ¶9.

A.    **Davidson's right to Incentive Compensation for the First Quarter of 2004 has
      been established under M.G.L. 149 § 148, as a matter of contract and under
      _Gram v. Liberty Mutual._**

The Employment Letter stated:

> You will be eligible to participate in the Deutsche Bank incentive pool in an amount
> contingent upon the profitability of Deutsche Bank's Operations, the performance of
> your division, and your individual contribution.

Nowhere does the Employment Letter limit the determination of Davidson's eligibility for incentive

compensation to an annual period.

Davidson asserts that he is entitled to receive the incentive compensation for the period in which he

worked in 2004 (nearly the entire first quarter).  The defendants, however, maintain that a contingency

found nowhere in the Employment Letter required Davidson to be employed at year end to be eligible to

receive incentive compensation and go on to state that "...there was no way to determine at that time -

even in the most speculative of terms - any of the factors that would inform a decision about his incentive

pay, including what Deutsche Bank's profitability would be at year-end, how Davidson's division would

perform, or what Davidson's contribution would be to either factor." Motion to Dismiss, p. 8.

Contrary to these  assertions, one need only look to a Deutsche Bank filing dated April 30,

2004 on Form 6-K with the Securities and Exchange Commission (a copy of which is attached

hereto as Exhibit A), to ascertain the profitability and Deutsche Bank and Davidson's division

during this time period.  In that report, Deutsche Bank reported quarterly net income of $1.159

billion[1] as compared to a loss of $270 million during the same period in 2003.  In addition, such

---

[1] The Quarterly Report sets out its figures in euros.  The figures quoted herein have been converted to U.S. dollars
based on the exchange rate on March 31, 2004 which was $1.2316. See, Euro Climbs; ECB's Trichet Still Predicts
Economic Recovery, Bloomberg News, April 1, 2004.

report went on to identify Davidson's division (sales and trading) as performing particularly well. Id., and separately sets out this division's financial performance in page 15 of the notes to the financial statements which show its sales during the period of $636 million as compared with $622 million during the same period in 2003. Accordingly, two of the three criteria (performance of Deutsche Bank and Davidson's division) called for in the Employment Letter for the payment of incentive compensation have easily been ascertained. Further, Davidson's performance during the period was as good if not better than it had been during past periods. *See* Paragraph 4 of the accompanying Affidavit of Christopher C. Davidson, dated September 2, 2004, hereinafter referred to as the "Davidson Affidavit" or "Davidson Aff." Accordingly and as further discussed below, Davidson maintains that such amounts are owed to him as wages under M.G.L. c. 149 § 148, as a matter of contract and under Gram v. Liberty Mutual Insurance Company, 384 Mass. 659, 672 (1981).

### B.  Davidson has pled sufficient facts to establish a claim under Section 510 of ERISA.

Under Section 1(b) of the Appendix to the Deutsche Bank Severance Plan (a copy of which is attached to the Complaint as Exhibit D hereinafter, the "Severance Plan"), Davidson would have been eligible to receive an amount equal to up to 50% of his 2003 incentive compensation award had his discharge occurred on or after April 1, 2004. This amount would have been $125,547. Deutsche Bank, however, terminated Davidson's employment on March 16, 2004.

In Count Four of the Complaint, Davidson alleges that Deutsche Bank timed his termination for the purpose of avoiding the payment of this amount in violation of 29 U.S.C. § 1140 (Section 510 of the Employee Retirement Income Security Act of 1974, as amended,

3

hereinafter, "ERISA"). Section 510 of ERISA makes it unlawful for any person to "…to discharge…or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan….or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan…"

Deutsche Bank seeks to have this count dismissed by arguing, in effect, that it may time the termination of an employee to avoid paying severance benefits. Motion to Dismiss, pp. 14-16. Despite Deutsche Bank's assertion, the law is clear, that in discharge to avoid paying benefits cases, the prohibited motive need only be *a* reason, not *the* reason for the complained of action. See, e.g. Huske v. Honeywell International, Inc., 298 F. Supp. 2d 1222, 1229 (D. Kan. 2004) (cause of action under ERISA Section 510 found to lie where employee who would have lost job in any case challenged the employer's characterization of her discharge as a termination rather than a layoff which would have entitled her to severance benefits). In addition, it has been held that in such cases "[t]erminating an employee within a short proximity of vesting of a welfare plan raises an inference of intentional activity." Id. Further, plaintiffs in cases such as the one at bar frequently must rely on indirect evidence to prove their cases. Id. Such indirect evidence is likely to be obtained through discovery and depositions – a process which has yet to begin in the current case. Accordingly, the defendants' motion should be denied.

C.  **Davidson has a right to Declaratory Judgment regarding the Non-Solicitation Provisions of Restricted Equity Plan.**

Pursuant to the Employment Letter, Davidson received substantial incentive compensation. Complaint, ¶ 8. Davidson understood this to be compensation for the services he previously performed during the relevant period. Davidson Affidavit, ¶ 2. The incentive compensation was paid partly in cash and partly in Deutsche Bank equities. Id. On the date of Davidson's termination, the equity paid to him as incentive compensation was worth approximately

4

$271,104. Complaint, ¶ 9. Such equity awards purport to be governed by the Deutsche Bank Restricted Equity Units Plan a copy of which is attached to the Complaint as <u>Exhibit C</u> (the "REU Plan"), though Davidson never executed such plan or a writing acknowledging his being bound by it. Deutsche Bank maintains, however, that under Section 5.2 of the REU Plan,[2] should Davidson, prior to 2008 (the final vesting date of his equity units), solicit any one of the countless clients it has had since its founding in 1870[3] including, the 21 million clients it had in 2003 or any of the millions of additional clients that it may obtain prior to 2008, in any of 74 countries in which Deutsche Bank does business (or any additional countries it may do business prior to 2008), he should forfeit approximately $271,104 in equity which has been awarded to him. As set forth below, this absurd result would find no countenance under Massachusetts law. Accordingly, the defendants' motion must be denied.

## STANDARD OF REVIEW

When considering a motion to dismiss, a court "….must accept the allegations of the complaint as true, and if, under any theory, the allegations are sufficient to state a cause of action in accordance with the law, [the court] must deny the motion to dismiss." <u>Vartanian v. Monsanto Company</u>, 14 F.3d 297, 700 (1st Cir. 1994); <u>Knight v. Mills</u>, 836 F.2d 659, 664 (1st Cir. 1987).

## ARGUMENT

I.    **DEFENDANTS' MOTION TO DISMISS COUNTS ONE THROUGH THREE MUST FAIL BECAUSE THE INCENTIVE COMPENSATION FALLS WITHIN THE PROTECTION OF THE WAGE ACT, IS DUE AS A MATTER OF CONTRACT AND MEETS THE STANDARD SET IN *GRAM v. LIBERTY MUTUAL*.**

---

[2] Section 5.1(c) of the REU Plan provides for automatic forfeiture if "…the Participant solicits, directly or indirectly, any company or entity who was a customer of DB at any time prior to the Vesting Date in order to provide (directly or indirectly) to such company or individual services similar to, competitive with, or intended to replace or serve as an alternative to, any or all of the services provided to such company or individual by DB."

[3] Figures quoted are from the Deutsche Bank publication "Deutsche Bank at a Glance" posted on its website (www.db.com) a copy of which is attached hereto as <u>Exhibit B</u>.

Davidson's employment was established under the Employment Letter which stated that:

> You will be eligible to participate in the Deutsche Bank incentive pool in an amount contingent upon the profitability of Deutsche Bank's operations, the performance of your division, and your individual contribution.

Accordingly, under the Employment Letter, Davidson is eligible to receive incentive compensation if Deutsche Bank and his division are profitable and Davidson's contributes to such profitability. In each of the past two years, Deutsche Bank has reported a profit. See, "Deutsche Bank at a Glance" publication posted on its website (www.db.com) a copy of which is attached hereto as Exhibit B (final page). Accordingly, under the Employment Letter, Deutsche Bank paid Davidson incentive compensation in an amount equal to or above this base salary in each such year. Complaint, ¶ 7. Contrary to the defendants' assertions, see Motion to Dismiss, pp. 6-9, the Employment Letter contains no terms limiting the determination of Davidson's eligibility for incentive compensation to an annual period or subjecting his right to receive the same to any such contingency.

The defendants argue that Davidson's assertion that he is entitled to incentive compensation must fail because such amounts cannot be determined. Motion to Dismiss, p.13. Such an assertion, however, is inconsistent with Deutsche Bank's own filings with the SEC. For instance, in an SEC filing dated April 30, 2004 on Form 6-K (a copy of which is attached hereto as Exhibit A the "Quarterly Report"), Deutsche Bank disclosed its results for the first quarter of 2004 (hereinafter the "Quarterly Report"). In that report, Deutsche Bank reported quarterly net income of $1.16 billion as compared to a loss of $270 million during the same period in 2003. (Introductory Pages). In addition, the Quarterly Report went on to identify Davidson's division (sales and trading) as performing particularly well stating that:

> Commission and fee revenues increased by [$112 million] to [$2.95 billion], mainly due to higher brokerage fees which grew by [$85 million], or 13%, to [$716 million]

> in the current quarter. Most of the increase was generated by our Sales & Trading
> (equities) business and by our Private Wealth Management business.

Id. And further stated that with respect to Davidson's division:

> Sales and trading (equity) produced [$968 million] of net revenues in the first quarter, a
> 32% increase on the same period in 2003.

Quarterly Report, p. 2. Furthermore, on page 15, the notes to the Quarterly Report separately set out the performance of Davidson's division. Davidson's performance during the period was also as good if not better than it had been during past periods. Davidson Affidavit, ¶ 4. Accordingly, the criteria set out in the Employment Letter for the payment of incentive compensation have been satisfied. As such, the incentive compensation is due and payable.

### A. **The Incentive Compensation is Protected By The Wage Act.**

The Wage Act protects the wages of employees – even highly compensated ones. Lohnes v. Darwin Partners, Inc., 15 Mass. L. Rep. 157 (Mass. Super. Ct. 2002) and Dobin v. CIOview Corporation, 16 Mass. L. Rep. 785 (Mass. Super. Ct. 2003). The Wage Act states that commissions will fall within its protection "….when the amount of such commissions, less allowable or authorized deductions, has been definitely determined and has become due and payable to such employee, and commissions so determined and due such employees shall be subject to the provisions of section one hundred and fifty." In determining what a commission is,[4] the case of Beaule v. M.S. Inserts & Fasteners Corp. is instructive:

> Simply because the M.S. Inserts' employees called the bonuses commissions, does not mean that they are commissions. If the bonus *acts* like a commission, however, calling them bonuses does not make it so. `Bonus is a word of flexible meaning.' *Attorney General v. Woburn,* 317 Mass. 465; 467, 58 N.E.2d 746 It 945). ` The offer of a bonus is the means frequently adopted to secure continuous service from an employee, to enhance his efficiency and to augment his loyalty to his employer, and the employee's acceptance of the offer by performing the things called for by the offer binds the employer to pay the bonus, so called.' *Id.* A promise to

---

[4] It has also been held that summary judgment is also not appropriate in cases involving instruments such as the Davidson's equity units. See, Brown v. Nortel Networks, Inc., 14 Mass. L. Rep. 544 (Mass. Super. Ct. 2002)("The issue of stock options as a wage is clearly an emerging issue" on which the appellant courts have not weighed in.)

pay a bonus may be part of the contract of service and not an offer of a mere gratuity. *Id.* citing *Zampatella v. Thomson-Crooker Shoe Co.,* 249 Mass. 37, 144 N.E. 82 (1924).

17 Mass. L. Rep. 623 (Mass. Super. Ct., 2004). The fact that a bonus or commission is subject to a contingency does not mean that such compensation falls outside the protection of the Wage Act, rather all that is required is that the "...commissions be 'definitely determined,' meaning that the contingency must already have occurred and the amount due be capable of being precisely ascertained." Lohnes, 15 Mass. L. Rep. 157.

Contrary to the defendants' assertions, Davidson is not seeking compensation for some unascertainable amount linked to Deutsche Bank's hypothetical performance for 2004. Rather, Davidson seeks compensation for the period in which he worked in 2004, namely, the first quarter. As mentioned above, the Employment Letter states that Davidson is eligible to receive the incentive compensation based upon the profitability of Deutsche Bank's operations, the performance of Davidson's division and his individual contribution. Such letter nowhere contains a requirement that such a determination be made at year end. In addition, as the Quarterly Reports shows both Deutsche Bank and Davidson's division as being profitable during this period. Further, Davidson's performance during the period was as good as if not better than it had been during past periods. Davidson Affidavit, ¶ 4. Accordingly, the incentive compensation is more than just a gratuitous gesture and, like Lohnes, is capable of being "definitely determined" as in prior periods and must be paid.[5] As such, the incentive compensation constitutes wages under the Wage Act and the failure to pay the same is a violation of such act.

---

[5] In fact, Deutsche Bank is now required to make such a determination pursuant to the duty of good faith and fair dealing inherent in every contract including those involving employment at will. Fortune v. National Cash Register, 373 Mass. 96 (1977).

In any event, the current matter, is not unlike that in <u>Barthel v. One Cmty., Inc.</u>, 233 F. Supp. 2d 125 (D. Mass. 2002). In <u>Barthel</u>, the plaintiff sued defendants for unpaid commissions under the Wage Act. Like the defendants in the current case, the defendants in <u>Barthel</u> argued that under <u>Cumpata v. Blue Shield of Massachusetts, Inc.</u>, 113 F. Supp. 2d 164 (D. Mass. 2000), the plaintiff's claims fell outside the protections in the Wage Act. Similar to <u>Lohnes</u>, the <u>Barthel</u> plaintiff argued that all commissions are contingent to some extent, but that once they are due and payable the commissions are covered by the Wage Act and further maintained that the disputed payments constituted a significant part of his income and not an episodic bonus. 113 F. Supp. 2d at 126-127. Presented with such arguments, the defendants' motion for summary judgment was denied so that the exact nature of the commissions could be ascertained upon the completion of discovery. <u>Id</u>. Like <u>Lohnes</u> the nature of the incentive compensation is the subject of dispute and has constituted a regular part of Davidson's income, see Davidson Aff., at ¶ 2. There can be little doubt that discovery in this matter would assist in clarifying its character. Accordingly, the defendants' motion to dismiss count one of the Complaint should be denied.

## B. As a Matter of Contract, Davidson is entitled to Incentive Compensation for 2004.

Davidson asserts that he is entitled to receive incentive compensation for the period in which he worked in 2004 (nearly the entire first quarter) under the Employment Letter. The defendants, however, maintain that Davidson must be employed at year end to be eligible to receive incentive compensation. Contrary to the defendants' assertions, nowhere in the Employment Letter is the determination of Davidson's eligibility for incentive compensation tied to an annual period.[6] As such, this court ought not to entertain such a proposition. <u>See</u>, <u>Cady v.</u>

---

[6] Even if such a condition can be found to be a condition of Davidson's right to incentive compensation, Davidson's failure to meet such condition should be excused under the doctrine of frustration of purpose. Under this doctrine, if after a contract is made, a party's principal purpose is frustrated without his fault by the occurrence of an event the

Marcella, 49 Mass. App. Ct. 334, 338 (2000)(even in absence of a merger clause, where written terms of a contract are not ambiguous on their face, extrinsic evidence is not admissible to contradict them.). The Employment Letter clearly states that Davidson will be eligible to receive incentive compensation based upon his contribution to the profitability of the bank and of his division. As noted previously, Deutsche Bank and Davidson's division reported large profits in the first quarter of 2004 as set forth in the Quarterly Report. Given this data and that Davidson's performance during the period was as good as, if not better than, it had been during past periods, Davidson Affidavit, ¶ 4, all the conditions have been fulfilled and the incentive compensation is due to Davidson under the Employment Letter. As such, Deutsche Bank's failure to pay the same is a breach of that contract.[7]

Under the terms of the Employment Letter, Deutsche Bank is also obligated to pay Davidson his incentive bonus unless his is terminated before the end of the year and such termination is for "cause" (as defined therein). The Employment letter sets out the parameters of the incentive compensation in three paragraphs. The first paragraph provides that Davidson will be "eligible to participate in the Deutsche Bank incentive pool in an amount contingent upon the profitability of Deutsche Bank's operations, the performance of your division, and your

non-occurrence of which was a basic assumption on which the contract was made, that party's remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary. See, Chase Precast Corp. v. John J. Paoenessa Co., Inc., 409 Mass. 371 (1991). Here, if one accepts Deutsche Bank's argument that the "cause" provision related to 2001 only and, despite it appearing nowhere in the Employment Letter, that incentive compensation was conditioned upon Davidson's being employed at year end, the failure to meet such condition should be excused as such failure is due exclusively to Deutsche Bank's actions.

[7] In addition, a under the doctrine of promissory estoppel, Deutsche Bank should not be allowed to benefit from Davidson's performance without fully compensating him for the same. See, Rooney v. Paul D. Osborne Desk Co., 38 Mass. App. Ct. 82, 87 (Mass. App. Ct., 1995)(Where court stated "[w]e are left, therefore, with the simple question whether the plaintiff, having rendered the services contemplated by the agreement, must now be deprived of the value of what he was promised in exchange, or whether the defendant corporation, having received the benefit of those services, shall be entitled to keep that benefit without delivering the fair value of what was promised but never delivered.", judgment for plaintiff on promissory estoppel theory upheld). Here, the promise of eligibility for incentive compensation was intended to induce Davidson to enhance sales in the course of his duties, Davidson did, in fact, undertake such action and, through the failure to pay him for such exhorts, Davidson has been harmed and Deutsche Bank enriched. Accordingly, Davidson should be awarded incentive compensation as a matter of promissory estoppel.

individual contribution." The second paragraph sets out Davidson's "Guaranteed Incentive Bonus" for the year ending in 2001. The third paragraph establishes the principle that Davidson is entitled to his incentive bonus "unless he is terminated before the end of the year and such termination is for cause."

The defendants contend that the "cause" provisions of the Employment Letter set out to define the parameters only for the payment of the "Guaranteed Incentive Bonus" in 2001. Davidson does not argue that he is automatically guaranteed a bonus in 2004 based on this provision. Instead, it is Davidson's position that this provision, when read in connection with the eligibility requirements set forth in the first paragraph (profitability of the bank and his division) establishes the principle that he will be eligible to receive incentive compensation if the conditions set forth in the first paragraph are met and his termination is not for cause. Therefore, Davidson maintains that he is due incentive compensation under the Employment Letter, as he meets all such criteria.

The compensation structure at Deutsche Bank, as it is at other investment banks, is such that individuals in the field of sales and trading receive incentive bonuses based on past service. Davidson Aff., ¶ 2. In fact, the lion's share of compensation for individuals in this field is in the form of an incentive bonus.[8] The Defendant's argument that the incentive bonus was only for the calendar year of 2001 is disingenuous. Given the prevailing practice in the industry, there is little reason why Davidson would have continued his employment at Deutsche Bank had his right to an incentive bonus been effective for only 2001. In addition, such an assertion is

---

[8] For instance, in 2002 and 2003, Davidson received a base salary of $125,000 and incentive compensation in an amount equal to or above this base salary. Complaint, ¶ 7. As such, the course of performance between the parties under the Employment Letter has been to pay substantial incentive compensation when the conditions set forth in the Employment Letter have been satisfied. See, Martino v. First National Bank of Boston, 361 Mass. 325, 332 (1972)(the parties action after they have made an agreement is often strong evidence of the meaning of particular terms in the agreement). Accordingly, this pattern of paying incentive compensation is strong evidence that the same is now owed to Davidson.

contrary to the practice between in the parties given that Davidson received a substantial amount of incentive compensation during each year of his employment. Id. Further, the language of the Employment Letter clearly mandates that Davidson is "eligible to participate in the Deutsche Bank incentive pool in an amount contingent upon the profitability of Deutsche Bank's operations, the performance of your division and your contribution." Therefore, Deutsche Bank has breached its employment contract with Davidson by failing to provide his incentive bonus. Accordingly, the defendants' motion to dismiss count two of the Complaint should be denied.

## C. Defendants' Motion to Dismiss Count Three Must Fail because Plaintiff's Incentive Compensation is "Reasonably Ascertainable" under *Gram v. Liberty Mutual.*

Under Gram v. Liberty Mutual Insurance Company, the Supreme Judicial Court held that the obligation of good faith and fair dealing imposed on an employer requires that the employer be liable for the loss of compensation related to an employee's past service, when the employee is discharged without good cause. 384 Mass. 659, 672 (1981). Under Gram, however, the amount of compensation due must be "reasonably ascertainable." Id.

Contrary to the defendants' assertions, Davidson is not seeking compensation for some unascertainable amount linked to Deutsche Bank's hypothetical performance for 2004. Rather, Davidson seeks compensation for the period in which he worked in 2004, namely, the first quarter. As mentioned above, the Employment Letter states that Davidson is eligible to receive the incentive compensation based upon the profitability of Deutsche Bank's operations, the performance of Davidson's division and Davidson's individual contribution and nowhere contains a requirement that such a determination be made at year end. In addition, given that the Quarterly Report shows both Deutsche Bank and Davidson's division as being profitable during this period and that Davidson's performance during this period was at least as good as or better than that in prior periods, Davidson's expectation of incentive compensation for his efforts

cannot be said to be unreasonable. Further, given the ready availability of the data contained in the Quarterly Report and the prior determinations of Davidson's incentive compensation under the Employment Letter, such compensation is "reasonably ascertainable." Because Davidson's claim for incentive compensation for the first quarter of 2004 meets the standard set by Gram, the defendants' motion to dismiss count three of the Complaint should be denied.

II.   **DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S ERISA CLAIM SHOULD BE DENIED BECAUSE PLAINTIFF CAN ESTABLISH A PRIMA FACIE CASE UNDER ERISA.**

   A.   **Plaintiff is not required to show that Defendants' *sole* motivation was to interfere with employee benefits; he need only show that it was *a* motivating factor.**

The procedure for pleading an ERISA section 510 case is established by Barbour v. Dynamics Research Corp., under which the plaintiff must first set forth a prima facie case by demonstrating: (1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which he might have become entitled. 63 F.3d 32, 37-38 (1st Cir. 1995). As stated in Barbour, the burden on the plaintiff in establishing a prima facie case is "de minimis." Id. at 38. Once the prima facie case has been established, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the action taken. Id. The plaintiff may then, thereafter, attempt to prove that the proffered reason is pretextual. Id.

Applied to the case at bar, Davidson has clearly established a prima facie case as required by Barbour. Davidson has alleged that Deutsche Bank terminated his employment on March 16, 2004 for the discriminatory purpose of interfering with his right to a special payment under the Severance Plan which he would have been eligible to receive had he been terminated on or after April 1, 2004. Complaint, ¶¶ 28 and 32. Accordingly, Davidson has met his "de minimis"

burden and the burden shifts to Deutsche Bank to purport a legitimate, non-discriminatory reason for its action – something which it has yet to do.

Citing Lehman v. Prudential Ins. Co. of America, 74 F.3d 323, 330-31 (1st Cir. 1996), Deutsche Bank argues that Davidson has not established a prima facie case because it asserts that a mere incidental loss of benefits is not actionable under 29 U.S.C. § 1140. In Lehman, an older worker claimed that a younger worker was hired for a position, instead of promoting plaintiff to that position, for the purpose of avoiding the high cost of the plaintiff's pension. Id. The plaintiff alleged that the defendant made adjustments to its company-wide pension plan which the plaintiff estimated increased the defendant's cost of funding his pension by approximately $500,000 over time. Id. at 331. However, the action that the plaintiff complained of was the actual hiring of the younger worker, not the timing of that hiring. Id. Because, as the defendant proved, the younger worker was more qualified for the position than the plaintiff, the First Circuit upheld the district court's ruling for summary judgment for the defendant, finding no genuine issue of fact either that Prudential was motivated by a discriminatory purpose or that the defendant's reason for not promoting the plaintiff was not credible. Id.

In the case at bar, Davidson alleges that the timing of his termination was made with a discriminatory eye towards depriving him of the opportunity to receive a special payment under the Severance Plan. Contrary to the defendants' assertions, in an ERISA section 510 case, the employee need not show that the action taken was *the* motivating factor for the adverse action, but, rather, *a* motivating for the adverse action. Huske v. Honeywell International, Inc., 298 F. Supp. 2d 1222, 1229 (D. Kan. 2004); Russell v. Northrop Gumman Corp., 921 F. Supp. 143, 147 (S.D.N.Y. 1996).

In Huske, the plaintiff employee was issued a company sponsored credit. Although defendant employer prohibited the personal use of these cards, the plaintiff used her card on many occasions for personal purchases. Although company policy stated that a violation could subject an employee to discipline, it did not require automatic termination. The company looked at each particular case to determine whether termination was warranted.

The plaintiff had been employed by the defendant since 1971. She received a corporate credit card in the mid-1990s and began using it for personal purchases as early as 1998. In June 2001, the defendant warned plaintiff about her personal use of the corporate card; the defendant had been notified by the credit card company that the plaintiff's account was delinquent. The plaintiff attributed her delinquency in payments to her husband's lack of steady work, her father's recent death, and to her providing financial support to her daughter, who was going through a divorce.

In September 2001, the defendant announced a plan to lay off 69 employees. In October 2001, plaintiff was terminated for misuse of the credit card. Shortly thereafter, only 68 employees were laid off. The laid off employees were eligible for severance benefits, but since plaintiff had been terminated for personal use of the credit card, she was not. The plaintiff filed suit against defendant for, *inter alia*, ERISA violations alleging that the improper acts were the characterization and timing of the discharge and not the discharge itself (as she would have been terminated in any event).

The district court agreed with the plaintiff's argument that the timing raised an inference that defendant terminated her employment to avoid paying her severance benefits and stated: "[t]erminating an employee within a short proximity of vesting of a welfare plan raises an inference of intentional activity." Id., citing Zimmerman v. Sloss Equipment, Inc., 835 F. Supp.

1283, 1288 (D. Kan. 1994). The court went on to state that "[t]erminating plaintiff's employment less than two weeks before the [reduction in force] in November of 2001 raises an inference of intentional, prohibited activity. Plaintiff has therefore established a prima facie case that [defendant] acted with specific intent to interfere with her rights under the severance pay plan." Id. See, Paradise v. Benefit Plans Comm., 1995 U.S. Dist. LEXIS 18091, *14-15 (D. Mass., 1995)(termination within six months of early retirement program gave rise to inference of discrimination in an ERISA section 510 case); Russell, 921 F. Supp. at 148 (timing of discharge and savings to employer are sufficient to give rise to the inference of discrimination); and Ehrlich v. Howe, 1992 U.S. Dist. Lexis 18269, * 11 (S.D.N.Y. 1992) (timing of discharge and savings to employer are sufficient to give rise to the inference of discrimination).

The same argument can be applied to the case at bar. Like the plaintiff in Huske, at this time, Davidson is not required to show that the Defendants' sole motivation in his termination was to interfere with his eligibility for a special payment; he need only show that it was a motivating factor by a preponderance of the evidence. In doing so, he may rely upon direct or indirect proof. Deutsche Bank argues, in essence, that it has free reign to time the termination of an employee with the specific intent of avoiding the payment severance benefits. Accepting this argument would exempt these claims from ERISA's protections which only Congress has the authority to do.[9] Like Huske, Deutsche Bank's termination of Davidson within two weeks before the date he could have been eligible for a special payment and savings of up to $125,547 provide the requisite evidence of an intent to discriminate. Further, due to the absence of a legitimate reason regarding the timing of the termination being put forth by Deutsche Bank and

---

[9] Congress enacted Section 510 of the ERISA to protect the employment status of plan participants against wrongful terminations and other discriminatory actions to deprive them of the right to attain employee benefits under ERISA plans. Congress enacted Section 510 primarily to prevent unscrupulous employers from discharging or harassing employees to prevent them from obtaining plan rights. See Huske, 298 F. Supp. 2d at 1226.

because the discovery process will undoubtedly yield insight into the reasons for the timing of Davidson's termination, this Court should hold that there is a genuine issue if triable fact and should deny Deutsche Bank's motion to dismiss Count IV of the complaint.

**B.   Under ERISA section 510 Davidson need only show that Deutsche Bank's action was taken with the intent to deprive him of a right to which he may have become entitled.**

Deutsche Bank's argument that count four of the Complaint should be dismissed because Davidson had no right to a special payment under the Severance Plan is incorrect. Under Section 510, a plaintiff need only show that the employer took action with the intent to interfere with a right to which participant *may* become entitled. *See* Choi v. Massachusetts General Physicians Org., Inc., 66 F. Supp. 2d 251, 254 (D. Mass. 1999); Phelps v. Field Real Estate Co., 991 F.2d 645, 649 (10th Cir. 1993). Accordingly, Davidson need only show and has shown in the Complaint, see ¶¶ 28-32, that Deutsche Bank took adverse action with the intent to deprive him of a right to which he may become entitled under the Severance Plan.   Accordingly, the defendants' motion must be denied with respect to count four of the Complaint.

**C.   In the Alternative to Plaintiff's ERISA Section 510 argument, this Court Should Find that the Severance Plan is not an ERISA Plan and Grant Davidson Leave to Amend the Complaint to Assert a Claim of Unlawful Discharge Under State Law.**

In the alternative to Davidson's ERISA Section 510 argument, this Court should find that the Severance Plan is *not* an ERISA plan and grant Davidson leave to amend the Complaint to assert a claim of unlawful discharge under Massachusetts law. Under ERISA, a "plan" is defined as "…an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan." 29 U.S.C. § 1003(3). The term "employee welfare benefit plan" means "…any plan, fund, or program… established or maintained by an employer … to the extent that such plan, fund, or

17

program was established or is maintained for the purpose of providing for its participants or their beneficiaries, ....benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits." Id. at (1). The term "employee pension benefit plan" means "...any plan, fund, or program which...established... provided retirement income to employees...or...results in a deferral of income by employees for periods extending to the termination of covered employment or beyond..." Id. at (2). The Severance Plan clearly does not fall into the definition of employee pension benefit plan, the question remains, however, as to whether the Severance Plan is an "employee welfare benefit plan" under ERISA.

In Fort Halifax Packing Co. v. Coyne, the Supreme Court held that a Maine statute requiring the payment of one week's pay for each year worked to workers displaced in plant closings was not an "employee welfare benefit plan" under ERISA. 492 U.S. 1, 6 (1987). The Court pointed out that there is a difference between mere "employee benefits," which are *not* covered by ERISA, and an "employee benefit plan," which *is* covered by ERISA, stating that an employee benefit plan is one which offers "benefits whose provisions by nature require an ongoing administrative program." Id. at 11. The Fort Halifax court went on to find that "[t]he requirement of a one-time, lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation...to do little more than write a check hardly constitutes the operation of a benefit plan. Once this single event is over, the employer has no further responsibility." Id.

Turning to the Severance Plan, under Section 2 thereof, a terminated Deutsche Bank employee is entitled to benefits under such plan if: (i) the employee remains in good standing through the date of termination; (ii) the employee settles his expenses, employer loans and returns employer property; and (iii) the employee executes a Release Agreement in the form and

18

within the time frame required by the employer. Sections 4 and 5 of the Severance Plan state that payments under such plan will be made in lump sum and that, subject to certain exceptions, all Deutsche Bank provided benefits will cease on termination. Accordingly, all the plan committee needs to do is determine whether the severed employee meets the standard of eligibility and write a lump-sum check. As such, the Severance Plan is not a an ERISA "plan" under Fort Halifax - notwithstanding the fact that the Severance Plan refers to itself as one.

As the Severance Plan is not an ERISA plan, Davidson requests leave to amend the Complaint to assert that the timing of his termination was motivated with the bad faith intent to deprive him of the special payment in violation of Massachusetts law. See, e.g., Fortune v. National Cash Register, 373 Mass. 96 (1977).

## III.  THE DEFENDANTS' MOTION TO DISMISS THE PLAINTIFF'S REQUEST FOR A DECLARATORY JUDGEMENT MUST BE DENIED BECAUSE THE PLAN PROVISION IN QUESTION IS MANIFESTLY UNREASONABLE.

Pursuant to the Employment Letter, Davidson received substantial incentive compensation. Complaint, ¶ 8. Davidson understood this to be compensation for the services he previously performed during the relevant period. Davidson Affidavit, ¶ 2. The incentive compensation was paid partly in cash and partly in Deutsche Bank equities. Id. On the date of Davidson's termination, the equity paid to him as incentive compensation was worth approximately $271,104. Complaint, ¶ 9. Such equity awards purport to be governed by the Deutsche Bank Restricted Equity Units Plan a copy of which is attached to the Complaint as Exhibit C (the "REU Plan"). Section 5.1(c) of the REU Plan provides for automatic forfeiture if "...the Participant solicits, directly or indirectly, any company or entity who was a customer of DB at any time prior to the Vesting Date in order to provide (directly or indirectly) to such company or individual services similar to, competitive with, or intended to replace or serve as an alternative

19

to, any or all of the services provided to such company or individual by DB." Davidson never

executed any document whereby he agreed to be bound by the terms of the REU Plan. Davidson

Affidavit, ¶ 3. At 32 years of age, necessity dictates that Davidson continues to work in his

chosen field. Davidson Affidavit, ¶ 7.

In its publication entitled "Deutsche Bank at a Glance" a copy of which is attached hereto

as Exhibit B (hereinafter, the "DB Fact Sheet"), Deutsche Bank states:

> Deutsche Bank is one of the world's leading international financial service
> providers. With roughly 66,000 employees, the bank serves customers in 74
> countries worldwide; more than half of the bank's staff work outside Germany.
>
> Our home market is Europe. A strong position in Europe, and especially in the
> German market, provides the basis of our global activities.
>
> As a modern universal bank, we offer our customers a broad range of first-class
> banking services. We provide private clients with an all-round service extending
> from account-keeping and cash and securities investment advisory to asset
> management. We offer corporate and institutional clients the full product
> assortment of an international corporate and investment bank - from payments
> processing and corporate finance to support with IPOs and M&A advisory. In
> addition, the bank has a leading position in international foreign exchange, fixed-
> income and equities trading.

DB Fact Sheet, p. 2. Further, Deutsche Bank boasts (as of 2003) of having over 21 million

clients. DB Fact Sheet, p. 7. The global breadth of Deutsche Bank's activities is succinctly set

forth on page 9 of the DB Fact Sheet which shows operations in Africa, Asia, Australia and

Europe as well as North and South America. Clearly, Deutsche Bank's global presence, breadth

of services and millions of clients show that the non-solicitation provision in the REU Plan,

amounts, effectively, to a non-compete with a term of five years (the expiration of the "cliff

vesting" under the REU Plan).

Deutsche Bank maintains that under Section 5.2 of the REU Plan (a plan Davidson never

signed), Davidson should forfeit approximately $271,104 in equity which has been awarded to

him, if, prior to 2008 (the final vesting date of his equity units), he solicits any one of the

countless clients it has had since its founding in 1870 including, the 21 million clients it had in

2003 or any of the millions of additional clients that it may obtain prior to 2008, in any of 74

countries in which Deutsche Bank does business (or any additional countries in which it may do

business prior to 2008).

Non-competition covenants resulting in forfeiture are evaluated under the same criteria as

other covenants not to compete. Kroeger v. Stop & Shop, 12 Mass. App. Ct. 310, 312 (1982).

With respect to covenants not to compete, the Supreme Judicial Court has stated:

> We reject the suggestion that an employee in a case such as this has made an
> agreement to which he must be held in all instances. Agreements of the
> character involved here often are not arrived at by bargaining between equals.
> The employer normally presents the terms on a 'take it or leave it' basis. This
> is particularly true where, as here, an annual agreement is presented to an
> employee whose options are to sign or to terminate his employment. We have
> not automatically held a former employee to the terms of his covenant not to
> compete. A test of reasonableness, based on the circumstances of the parties
> and the public interest, has been traditional in our cases involving covenants
> not to compete. We have enforced the covenants only to the extent that the
> restraint is reasonable in time and place and necessary to protect the former
> employer's trade secrets, confidential information, or good will.

Cheney v. Automatic Sprinkler Corp., 377 Mass. 141, 147 (1979)(internal citations omitted).

The application of these principles to the case at bar, leads to the inevitable conclusion

that the forfeiture advocated by Deutsche Bank is manifestly unreasonable. First, the terms of

REU Plan were imposed on Davidson on less than a "take it or leave it" basis. In fact, Davidson

never signed the REU plan or executed a writing recognizing the efficacy of its terms. Second,

Deutsche Bank has not alleged that the forfeiture of the REUs would further some legitimate

business interest.[10] Third, due to the worldwide scope of Deutsche Bank's operations and

---

[10] Davidson maintains that a large majority of the client relationships he capitalized on during his employment with Deutsche Bank were established during his work for a prior employer. Davidson Affidavit at ¶ 5. Accordingly, any goodwill associated with such clients belongs to Davidson and not Deutsche Bank and, therefore, is not subject to

breadth of its client base in the financial services industry, Section 5.1(c) of the REU Plan amounts to a virtual worldwide banishment of Davidson from this field. [11]  Given that Deutsche Bank conducts operations on six of seven continents, the effective geographic reach of Section 5.1(c) is unreasonable.  Fourth, given the enormous number of Deutsche Bank past, current and future clients and its volume of business as well as the unspecified interest which the forfeiture would protect, the time period of five years is also unreasonable.  Fifth, the enforcement of the Section 5.1(c) would be anti-competitive and, hence, contrary to the public interest as well as inequitable as it would force Davidson to choose between productive employment and losing approximately $271,104. See, Economy Grocery Stores Corp. v. McMenamy, 290 Mass. 549 (1935)(refusal to enforce non-competition covenant when an employee is terminated without cause).

Defendants argue that the REUs ought to be forfeited under Kroeger because they are not vested. Terms like "vested" and "unvested", however, do not automatically control disputes over future compensation for past service. See Sargent v. Tenaska, Inc., 108 F.3d 5, 8 (1st Cir. 1997). Instead, the analysis must focus on whether the "unvested" interests relate to past or future services. Sargent v. Tenaska, Inc., 108 F.3d at 8.  Given that the REU Plan itself contemplates the retention of REUs after the termination of employment in certain situations, see, e.g., REU Plan, § 6.1 (death or disability), and that such awards were presented to Davidson as part of his annual compensation, see Davidson Aff., ¶ 2, there is ample reason to find that a material issue of fact exists with respect to the nature of such compensation.  In addition the facts at bar differ

---

Section 5.1(c) of the REU Plan.  See, Sentry Ins. v. Firnstein, 14 Mass. App. Ct. 706, 708 (1982)("The objective of a reasonable noncompetition clause is to protect the employer's good will, not to appropriate the good will of the employee.").

[11] Even if Section 5.1(c) of the REU Plan was found to be enforceable, as a matter of equity and fairness, Deutsche Bank should be required to provide Davidson with a list of its millions of current and past clients and to update the same periodically so that Davidson does not unknowingly breach this provision.

significantly from <u>Kroeger</u> thereby warranting a different outcome.  <u>See</u>, <u>Cheney.</u>, <u>377 Mass. at</u>

<u>147</u> (determinations made on a case-by-case basis).  <u>Kroeger</u> involved the forfeiture of a portion

of deferred compensation by a highly-experienced, former chief financial officer of a large

company who violated the non-competition terms of an agreement that he actually signed.  In

addition, <u>Kroeger</u> had negotiated an agreement with his follow-on employer that saw that

employer paying the executive for any income forfeited under the agreement in question.  Here,

Davidson did not sign the REU Plan or otherwise acknowledge the efficacy of Section 5.1(c),

lacks the depth of experience of the executive in <u>Kroeger</u> (lowering any interest to be protected

by such clause) and has no agreement with a third party which underwrites his risk.

Accordingly, the result in <u>Kroeger</u> (partial forfeiture of compensation), ought not to apply in the

case at bar.  Such a result would be especially inequitable if made at the nascent stage of this

case.

## CONCLUSION

For the reasons discussed above, the defendants' Motion to Dismiss should be denied.  If, however, the court finds that any of the relief requested by the defendants in such motion should be granted, Davidson hereby requests leave to amend the Complaint to address any shortcomings.

CHRISTOPHER C. DAVIDSON

By his attorneys,

CRAIG AND MACAULEY
 PROFESSIONAL CORPORATION

Dated:  September 1, 2004

Christopher J. Panos (BBO#555273)
Peter I. Dunn (BBO# 641307)
Allison M. O'Neil (BBO# 641330)
Craig and Macauley
 Professional Corporation
Federal Reserve Plaza
600 Atlantic Avenue
Boston, Massachusetts  02210
(617) 367-9500

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail on September 1, 2004.

Peter I. Dunn