UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHRISTOPHER C. DAVIDSON,<br>    Plaintiff,<br><br>vs.<br><br>DEUTSCHE BANK SECURITIES, INC.,<br>DEUTSCHE BANK AMERICAS<br>HOLDING CORPORATION, and<br>DEUTSCHE BANK AMERICAS<br>SEVERANCE PAY PLAN,<br><br>    Defendants | Civil Action No. 1:04-cv-11027-RGS |

### **REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

In opposing the motion to dismiss, plaintiff all but ignores the single most glaring flaw in this lawsuit, namely, that the potential additional awards of compensation for which he sues are, according to the plain terms of the governing documents, <u>contingent on several indefinite factors</u>, and that both the fact and amount of any such awards are <u>wholly dependent on Deutsche Bank's discretion</u>.  This defect is directly fatal to the first four of plaintiff's five claims.  That is, because the potential award of compensation is contingent and discretionary:

  ●   it is not a "wage" under the Wage Act;

  ●   defendants had no contractually binding obligation to pay any part of such award;

  ●   plaintiff cannot establish that he "earned" any ascertainable part of such a contingent award to compensate him for particular past services under *Gram*; and

  ●   it cannot give rise to an actionable claim under ERISA.

Plaintiff's last claim, for a declaratory judgment allowing him to continue the vesting of his restricted equity units even though he "intends" to violate the non-solicitation restriction in the plan governing such equity awards, should be dismissed as well because (1) plaintiff's allegations do not support a reasonable inference that his unvested equity units were granted to him as compensation for past services; and (2) plaintiff has failed to allege that an *actual* controversy exists concerning the application of the non-solicitation restriction to a particular (rather than hypothetical) set of circumstances.

I.   **THE CONTINGENT AWARD OF INCENTIVE BONUS COMPENSATION IS NOT A "WAGE" UNDER THE MASSACHUSETTS WAGE ACT.**

Plaintiff's opposition does not mention, much less seek to distinguish, any of the cases cited in defendants' brief – including a decision rendered by this Court – which establish that <u>contingent incentive compensation such as that for which plaintiff sues is not a "wage"</u> within the meaning of the Massachusetts Wage Act.  *See* Defendants' Motion to Dismiss All Counts and Memorandum of Reasons in Support Thereof ("MTD") at 7-8 & n.4 (citing cases, including *Baptista v. Abbey Healthcare Group, Inc.*, No. 95-10125-RGS (D. Mass. Apr. 10, 1996) (1996 WL 33340740)).

The cases that plaintiff does cite are not on point either legally or factually, and cannot support his Wage Act claim.  They primarily address <u>commissions</u>, which the Wage Act, by express amendment, covers separately and distinctly.  *See* M.G.L. c. 149, §148 ("[t]his section shall apply, so far as apt, to the payment of <u>commissions</u> when the amount of such commissions, less allowable or authorized deductions, has been definitely determined and has become due and payable to such employee") (emphasis added).  Plaintiff does not attempt to, and cannot reasonably, argue that the potential incentive

2

compensation award qualifies as a "commission" under the Wage Act. Accordingly, the cases plaintiff cites are wholly inapplicable here and cannot support his Wage Act claim.[1]

Moreover, to the extent they are relevant at all, plaintiff's cases only underscore the fact that the potential incentive compensation award he seeks does not fall within the Wage Act. In *Beaule v. M.S. Inserts & Fasteners Corp.,* No. 012056 (Mass. Super. Ct. Feb. 24, 2004) (2004 WL 1109796 at *3), for example, the court distinguished so-called "bonus" commissions, which were calculated monthly by a mathematical formula and based on the employee's individual sales, from contingent incentive pay ("additional compensation based on profitability annually") which it recognized fell outside the Wage Act, citing *Cumpata v. Blue Cross Blue Shield of Mass., Inc.,* 113 F. Supp. 2d 164, 167-68 (D. Mass. 2000). Similarly in *Dobin v. CIOview Corp.,* No. 01-00108 (Mass. Super. Ct. Oct. 29, 2003) (2003 WL 22454602 at *5), the court noted that if plaintiff were to receive a lump-sum payment above and beyond her base salary if she worked at least 100 days, her entitlement to that sum would be conditional upon her having worked that number of days. The court indicated that, unlike the plaintiff's base salary, such a contingent payment would not be a wage. *Id.*

Plaintiff offers no authority that could support the recovery of a contingent benefit under the Wage Act, nor does he point to any facts that could reasonably allow an inference that the incentive award he seeks is not contingent. Plaintiff acknowledges, as he must, that his employment letter provides only that he will be "eligible to participate in

---

[1] Defendants are also mystified by plaintiff's assertion, in opposition to dismissal of the Wage Act claim, that "summary judgment is not appropriate in cases involving instruments such as the Davidson's [sic] equity units." Plaintiff's Opposition to Defendant's Motion to Dismiss All Counts and Memorandum in Support Thereof ("Opp'n") at 7 n.4. Plaintiff's Wage Act claim on its face is not based on any right to equity units, but is based solely on his asserted right to a portion of an incentive compensation bonus. *See* Cp. ¶17.

the Deutsche Bank incentive pool in an amount <u>contingent</u> upon the profitability of Deutsche Bank's Operations, the performance of your division, and your individual contribution." Opp'n at 2 (emphasis added). Contrary to plaintiff's argument, his assertion that these "contingencies" were supposedly met for the first quarter of 2004 -- i.e., that Deutsche Bank was profitable, that plaintiff's division performed well, and that plaintiff contributed to its performance – cannot support any reasonable inference that plaintiff was entitled to payment of <u>any</u> incentive compensation award for 2004, much less in any particular amount. Nothing in the employment agreement indicates the particular levels of profitability, performance, or contribution upon which an employee may become eligible for an incentive award, nor does it provide any formula by which incentive compensation awards may be calculated, nor does it guarantee the payment of <u>any</u> incentive compensation for any year other than 2001. Similarly, the agreement does not purport to specify how any of the contingencies would translate into any particular amount of bonus compensation, nor does it purport to constrain Deutsche Bank in any way in determining these matters. Indeed, although plaintiff insists that his incentive compensation is "capable of being 'definitely determined,'" he does not and cannot proffer even a guess as to the amount of the award he claims he might have received in 2004, which only highlights the obvious fact that it cannot be determined. Opp'n at 8.

In short, because plaintiff's own allegations establish that the incentive compensation he seeks is <u>wholly contingent, discretionary, and undeterminable</u>, and because it is well established that such contingent compensation is not a "wage" under the Wage Act, Count 1 should be dismissed.

4

II. **DEUTSCHE BANK HAS NO CONTRACTUAL OBLIGATION TO PAY PLAINTIFF ANY PART OF AN INCENTIVE COMPENSATION AWARD FOR 2004.**

Plaintiff has similarly failed to offer any basis to claim that Deutsche Bank undertook a contractually binding obligation to pay plaintiff incentive compensation for 2004. Plaintiff does not deny that the only guarantee of an incentive award in the employment agreement relates to plaintiff's incentive award for 2001. Plaintiff offers no valid basis for interpreting the agreement as establishing any such obligation for 2004.

First, plaintiff errs in suggesting that the court should discern a contractually binding obligation to pay plaintiff an incentive award for 2004 in the first sentence of the letter's section on "Incentive Compensation," which provides: "[y]ou will be eligible to participate in the Deutsche Bank incentive pool in an amount contingent upon the profitability of Deutsche Bank's operations, the performance of your division, and your individual contribution." Complaint ("Cp."), Exhibit A. Under Massachusetts law, a promise is not contractually binding if it is "too vague and indefinite to be enforceable." *Held v. Zamparelli*, 13 Mass. App. Ct. 957, 958-59, 431 N.E.2d 961, 962 (1982). The court in *Held* ruled that a profit-sharing agreement could not be enforced where it was silent on essential terms, including when plaintiff's share of profits was to be computed and paid. As the court explained, "[c]onstruction and enforcement of the agreement without … essential terms would be futile, and we cannot supply these provisions without writing a contract for the parties which they themselves did not." 431 N.E.2d at 962. *See also Lieberman v. Storagenetworks, Inc.*, 60 Mass. App. Ct. 1118, 804 N.E.2d 961 (2004) (2004 WL 360489 at *1-2) (unpublished opinion) (oral agreement to grant plaintiff stock options unenforceable where the parties "did not discuss or agree upon the critical matter

5

of the timing for vesting of the stock options"; contract "too vague and indefinite" to be enforceable, and court may not supply basic provisions that parties have not included in the contract); *Coll v. PB Diagnostic Systems, Inc.*, 50 F.3d 1115, 1123 (1st Cir. 1995) (affirming summary judgment dismissing employee's contract claim; "to turn the words [in employment contract] 'we intend to jointly explore appropriate methods of compensation' into a binding obligation to develop, fund, and implement a [long-term incentive plan that would pay plaintiff a certain amount] would be completely at odds with the common and natural meaning of the words"). Similarly here, the provision of the employment agreement on which plaintiff relies does not create any enforceable obligation because it is silent as to what degrees of "profitability," "performance," and "contribution" may permit an employee to become eligible for an incentive bonus award, much less as to how the amount of any such discretionary award might be calculated based on such factors. Even assuming that this language could be read as requiring Deutsche Bank to do anything at all, there is no way for the court to determine what might be required. Accordingly, it is not a binding obligation, as a matter of law.

There is similarly no merit in plaintiff's assertion that the court should recognize somewhere in the penumbra of the employment agreement the unstated "principle that [plaintiff] will be eligible to receive incentive compensation if the conditions set forth in the first paragraph are met and his termination is not for cause." Opp'n at 11. Holding the parties to any such unarticulated "principle" would be directly at odds with the common and natural meaning of the words of the agreement, and would impermissibly read into the contract an obligation to which the parties never agreed. The very fact that the parties guaranteed incentive compensation <u>only</u> for plaintiff's <u>first</u> year of

employment at Deutsche Bank, and made no promises with respect to any other year, negates any suggestion that they intended to guarantee any such award in subsequent years. After 2001, whether the plaintiff would receive an incentive bonus award, and, if so, the amount of that award, rested squarely within the discretion of Deutsche Bank.

Contrary to plaintiff's evident belief, the parties' course of dealing and the compensation paid by "other investment banks" cannot import into the agreement any commitment that Deutsche Bank did not undertake. Trade usage and course of dealing are relevant to a contract only when they are needed to interpret the meaning of an ambiguous term. *See Cardone v. Boston Regional Medical Center, Inc.,* 60 Mass. App. Ct. 179, 186, 800 N.E.2d 335, 341 (2003); *Lanier Professional Services, Inc. v. Ricci*, 192 F.3d 1, 4 (1st Cir. 1999). They have no relevance here because the employment agreement contains no ambiguity that requires interpretation; it is obvious that nothing in the letter requires an incentive award in 2004.

Plaintiff also errs in arguing that, because the employment agreement does not explicitly state that he must be employed at year end to receive incentive compensation for any particular year, he was therefore entitled to a pro-rated award when he was terminated in March 2004. Plaintiff has it precisely backwards: because there is nothing in the employment agreement that provides that he is entitled to an incentive award for 2004, he cannot establish entitlement to any award at all, much less to a pro-rated portion for a partial year of employment.

Finally, there is no merit in plaintiff's attempt to justify his contract claim on his newly asserted theory of promissory estoppel. A promisee's reliance on a promise may substitute for consideration to bring about the formation of a binding and enforceable

7

contractual obligation on a promissory estoppel theory only if the promisee can prove "all the necessary elements of a contract" other than consideration.  *Rhode Island Hosp. Trust Nat'l Bank v. Varadian*, 419 Mass. 841, 850, 647 N.E.2d 1174, 1178-79 (1995).  Because the employment agreement fails to evidence any binding promise to pay plaintiff any bonus for 2004, plaintiff could not recover on a promissory estoppel theory any more than he can on a contract theory.  Additionally, to establish promissory estoppel, a plaintiff must show that his reliance on the purported promise was reasonable.  *O'Blenes v. Zoning Bd. of* Appeals, 397 Mass. 555, 558, 492 N.E.2d 354, 356 (1986).  An employee as a matter of law cannot claim reasonable reliance on a purported promise of incentive compensation where he can point only to a "well-founded hope" of receiving such compensation.  *See Okerman v. VA Software Corp.,* No. 0101825 (Mass. Super. Ct. Jul. 9, 2003) (2003 WL 21960599 at *7), *quoting Horizon House Microwave, Inc.,* 24 Mass. App. Ct. 84, 506 N.E.2d 178 (1987) (plaintiff could not claim reasonable reliance, for purpose of promissory estoppel theory, on indefinite promise that he would receive a windfall from his vested stock options because he knew his ultimate gain could not be predicted).  In short, Count 2 fails regardless of the theory.

### III.    *GRAM* DOES NOT ALLOW PLAINTIFF TO RECOVER ANY PART OF A POTENTIAL INCENTIVE COMPENSATION AWARD FOR 2004.

Plaintiff's *Gram* claim in Count 3 should be dismissed because he has made no attempt to show that any discretionary incentive award he might have received for 2004 would have represented compensation for services he rendered before his termination. Indeed, the fact that such an award is, by its terms, dependent not only on an assessment of plaintiff's own performance but also of Deutsche Bank's overall profitability is inherently inconsistent with any such claim.

Additionally, although plaintiff acknowledges that even earned compensation for past services must be "reasonably ascertainable" to be recoverable under *Gram*, Opp'n at 12, he offers no authority or even argument to support his conclusory assertion that the incentive compensation award he claims he might have received for 2004 can in fact be reasonably ascertained. Plaintiff's bare assertion that three "contingencies" occurred – to wit, Deutsche Bank was "profitable" at the time of his termination, his division had performed "well," and that his performance was "as good if not better than it had been" in the past (Opp'n, pp. 6-7) -- falls far short of showing that that Deutsche Bank would have exercised its discretion to provide him an incentive bonus award in 2004, and it does not begin to explain how the <u>amount</u> of any such award might have been calculated or ascertained. Notably, nowhere in his Opposition does Davidson even attempt to calculate the amount of the incentive bonus to which he claims he is entitled. The reason is simple: there is no formula for such a bonus, and it is not "reasonably ascertainable" and "clearly defined" compensation for past services within the scope of *Gram*. *Gram v. Liberty Mutual Insurance Company*, 384 Mass. 659, 670, 671 n. 10 (1981).

Because the award of an incentive bonus depends upon the discretion of Deutsche Bank, and because the amount of such bonus is not clearly defined and reasonably ascertainable or calculable, Davidson's demand for an undefined, pro-rated payment of a contingent incentive bonus falls decidedly outside the scope of permissible recovery under *Gram*. Count 3 should be dismissed.

## IV.     PLAINTIFF FAILS TO STATE A CLAIM UNDER ERISA.

### A.     Plaintiff Has Failed to Sufficiently Plead the Elements of an ERISA Claim.

Plaintiff's opposition fails to remedy the fatal defects in his ERISA claim as well. Despite defendants' express challenge, plaintiff does not, and obviously cannot, claim that the decision to terminate him – as opposed to its "timing" (on March 16, 2004, rather than April 1, 2004) – was motivated by the intent to interfere with his eligibility to be considered for a discretionary "special" payment under the Severance Plan. None of the cases plaintiff cites suggest that this sort of incidental consequence resulting from the timing of a properly motivated decision to terminate an employee can support a claim for a violation of §510. To the contrary, they establish only that when a plaintiff alleges facts suggesting that the timing of a discharge is suspicious – such as a termination when the employee is on the verge of vesting certain substantial and enforceable benefits – the timing of the discharge may be sufficient to create an inference that the decision to terminate him was motivated by the intent to deprive him of those benefits. In *Russell v. Northrup Grumman Corp.,* 921 F. Supp. 143, 148-49 (S.D.N.Y. 1996), for example, on which plaintiff relies, the court deemed plaintiff's factual allegations sufficient to support an inference that his termination was discriminatory when plaintiff was terminated just a few months before the end of the 20-year period on which his substantial pension benefits would have vested. Similarly in *Huske v. Honeywell International, Inc.,* 298 F. Supp. 2d 1222, 1228-29 (D. Kan. 1994), the court held that the timing of plaintiff's termination – less than two weeks before a large reduction in force in which plaintiff would have been entitled to severance benefits – supported an inference that her termination was motivated

10

by the intent to deprive her of those severance benefits.[2]  However, nothing in these cases comes close to suggesting that a termination such as plaintiff's here, which is not alleged to have been motivated by any intent to deprive plaintiff of benefits, may be deemed to violate ERISA merely because its "timing" deprived the plaintiff of being considered for indefinite and incidental benefits.  Because plaintiff's "timing" theory is not viable, Count 4 should be dismissed, without more.

But even assuming that plaintiff had actually alleged that his <u>termination</u> (rather than its timing) was motivated by the intent of depriving him of any "special" payment under the Severance Plan, the ERISA claim should be dismissed because plaintiff has failed to plead facts that could support any such reasonable inference.  As plaintiff's own cases recognize, to state a prima facie case under ERISA the plaintiff must plead "that he was discharged … under circumstances which give rise to an inference of discrimination," and to do so, he may not rely on "mere conclusions," but must instead "use language which gives rise to an inference of intent."  *Russell*, 921 F. Supp. at 149.[3]  Here, plaintiff has failed to point to any facts that could support a reasonable inference that defendant terminated him to interfere with any <u>"right"</u> to which he might be entitled under ERISA.  Plaintiff does not deny (or even address the fact) that, under the plain terms of the Severance Plan, even if he had been terminated on or after April 1, rather

---

[2]   *See also Paradise v. Benefit Plans Committee*, Civ. A. No. 93-40113-NMG (D. Mass. Nov. 29, 1995) (1995 WL 708659 at *1) (plaintiff terminated after more than 30 years of employment and just two months before he would have accumulated the 90 longevity points he needed – one for each year of employment, and one for each year of his age – to receive early retirement benefits); *Ehrlich v. Howe*, No. 92 Civ. 1079 (PNL) (S.D.N.Y. Dec. 1, 1992) (1992 WL 373266 at *4) (timing of discharge and resultant savings to defendant may create an inference that plaintiff's termination was motivated by discrimination).

[3]   *See also Clapp v. Greene*, 743 F. Supp. 273, 276-77 (S.D.N.Y. 1990) (dismissing §510 claim where plaintiff failed to allege facts to support claim that she was terminated to deprive her of attaining pension benefits; conclusory assertions insufficient); *Mercado Garcia v. Ponce Federal Bank*, 58 Fair Empl. Prac. Cases (BNA) 270 (D.P.R. Mar. 22, 1991) (1991 WL 333729) (dismissing §510 claim where "plaintiffs allege no facts which support their conclusion that defendants terminated plaintiff … in order to interfere with his pension benefits").

11

than on March 16, <u>he would have had no "right" to the additional "special" severance payment he seeks</u>. Instead, he would have been eligible only to be "considered" – i.e., thought about – for a possible award in some unstated amount that might be "up to" 50% of his previous year's incentive compensation, but, then again, might be as low as zero. Plaintiff does not claim any greater "right" than this to the "special" severance benefit; he has made no attempt to distinguish the cases cited by defendants which establish that §510 covers only a "right to which an employee may become entitled pursuant to an <u>existing, enforceable obligation</u> assumed by the employer," *see* MTD at 17; and he has failed to cite any case that suggests that such a <u>discretionary, indeterminate, and contingent</u> potential benefit could be deemed a "right" within the meaning of §510.[4] (Emphasis added.)  Count 4 therefore fails for this reason as well.

And no less significantly, in view of the vague and undeterminable nature of the additional "special" severance benefit that plaintiff seeks to recover, plaintiff cannot be deemed to have alleged facts that create a reasonable inference that he was <u>terminated</u> with the intent of depriving him of such a benefit (or, indeed, that even the <u>timing</u> of his termination was so motivated, assuming that such an allegation could support a §510 claim).  In other words, where plaintiff's own allegations establish that Deutsche Bank would have had no obligation to pay plaintiff anything more than it did if it had terminated him on April 1 rather than March 16, there is no basis for any reasonable

---

[4] Plaintiff errs in suggesting that §510's protection of "rights" to which an employee "may" become entitled somehow means that §510 encompasses wholly contingent and discretionary benefits, such as the "special" severance award for which plaintiff sues.  The cases plaintiff cites in this regard stand at best for the unremarkable proposition that §510 protects otherwise enforceable benefits even when they have not vested.  *See, e.g., Phelps v. Field Real Estate Co.,* 991 F.2d 645 (10th Cir. 1993) (employer allegedly discharged employee with AIDS to keep him from benefiting from health coverage); *Choi v. Massachusetts General Physicians Org'n, Inc.,* 66 F. Supp. 2d 251 (D. Mass. 1999) (employer allegedly amended benefit plan to keep plaintiff from obtaining a bonus he would otherwise have received).

12

inference that it terminated him on March 16 for the purpose of depriving him of such a payment.

In short, plaintiff has failed to plead even the barest elements of a prima facie case under §510. He has also failed to plead any facts that could support a reasonable inference that he was terminated to deprive him of severance benefits. Count 4 should therefore be dismissed.

### B. Plaintiff Cannot Save His ERISA Claim by Purporting to Assert a *Fortune* Claim Under Massachusetts Law.

Evidently recognizing the defects in his ERISA claim, plaintiff now argues – in direct contravention of his allegation that "[t]he Severance Plan is an employee benefit plan established under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §1001 et seq. ('ERISA')" -- that "this Court should find that the Severance Plan is not an ERISA plan" and allow plaintiff to amend his Complaint to assert a state-law claim for "unlawful discharge" under *Fortune v. National Cash Register*, 373 Mass. 96, 364 N.E.2d 1251 (1977). Cp. ¶4; Opp'n at 17-19 (emphasis in original). Regardless of whether plaintiff has any right to contradict his own allegation by such an "alternative" theory (asserted only in opposition to a motion to dismiss, not in any complaint or proposed amendment), and regardless of the merits of his new argument that the Severance Plan is not an ERISA plan, plaintiff plainly cannot avoid the dismissal of his deficient ERISA claim by seeking leave to amend his complaint to add a new state-law claim.

But even assuming that plaintiff's proposed amendment had any relevance to defendants' motion to dismiss, the amendment should be denied because the factual allegations offered in support of plaintiff's ERISA claim fail in any event to state a claim

13

under *Fortune* for recovery of the discretionary "special" severance payment he seeks. *Fortune* prohibits an employer from reaping an unjust benefit from terminating an employee who is on the verge of receiving compensation he has earned, where the termination is motivated by the intent to deprive him of that compensation. *See Fortune* 364 N.E.2d at 1257-58. As the First Circuit has recognized, to succeed on such a claim a plaintiff must show "that [the employer] terminated him without good cause and in bad faith in order to deprive him of commissions that have <u>already been earned</u> or were <u>reasonably ascertainable</u> based on past services." *Michelson v. Digital Financial Services*, 167 F.3d 715, 726 (1st Cir. 1999) (emphasis added). Where, as discussed above, plaintiff has not even alleged that defendants' intent in terminating him was to deprive him of a "special" severance benefit; where plaintiff cannot claim to have earned the discretionary severance benefit as compensation for any past services; where plaintiff would have had <u>no right to such a "special" payment even if he had been terminated on April 1 rather than March 16</u>; and where the amount of any such potential payment is not reasonably ascertainable, the proposed amendment would be futile because plaintiff cannot state a claim under *Fortune*.

V. **PLAINTIFF'S REQUEST FOR A DECLARATORY JUDGMENT SHOULD BE DISMISSED.**

    A. **Massachusetts Law Would Allow the Forfeiture of Plaintiff's Unvested Equity Interests if He Were to Violate the Non-Solicitation Condition in the REU Plan.**

Plaintiff's complaint purports to seek a declaratory judgment that his unvested restricted equity units (REUs) "would not be subject to forfeiture even if he solicits Deutsche Bank clients or otherwise violates the [non-solicitation] provisions of Section 5.1" of the REU Plan. Cp. ¶37. Plaintiff relies on *Kroeger v. Stop & Shop Companies,*

14

*Inc.,* 13 Mass. App. Ct. 310, 432 N.E.2d 566 (1982), for the proposition that "earned" benefits should not be forfeited by the violation of a non-compete provision, and thus evidently seeks a declaratory judgment on the ground that his unvested REUs were "earned" for past services and not forfeitable. Cp. ¶¶36, 37. He does not, however, deny that *Kroeger* holds that a former employee's <u>unearned</u> and <u>unvested</u> deferred compensation <u>may be forfeited</u> if he violates a non-compete agreement. Nor does plaintiff offer anything that could reasonably support an inference that the unvested portions of his REUs represent compensation he had earned for past services to Deutsche Bank.

He points to nothing in the REU plan, for example, and there is nothing, that suggests that the unvested REUs were intended to compensate plaintiff for his past services. Similarly, he does not deny that the terms of the plan make clear that the future-vesting units are intended to motivate his <u>future</u> conduct, not to compensate him for past services. *See* Cp., Exhibit B (REU Plan, at "Overview, Award Granted in February 2003") (REUs are awarded "in anticipation of <u>ongoing contribution</u> to the success of the organization, and to <u>align the interests</u> of employees and Deutsche Bank shareholders") (emphasis added). Rather than address the plain import of this language, plaintiff apparently seeks to brush it aside, asserting that he "never signed the REU plan or executed a writing recognizing the efficacy of its terms," and even, remarkably, that the plan that granted him these extra benefits was "imposed" on him "on less than a 'take it or leave it' basis." Opp'n at 21.[5] (Notably, however, plaintiff does <u>not</u> claim that he was unaware that the plan governed his rights to vest REUs.)

---

[5]   The REUs were not the only components of the financial incentives that Deutsche Bank granted the plaintiff. Plaintiff also received substantial cash bonuses for each year he worked at Deutsche Bank.

15

Plaintiff's efforts to disclaim the REU plan border on the frivolous, particularly in view of his express allegation that the equity units were awarded to him "pursuant to a certain Deutsche Bank Restricted Units Plan" attached to the Complaint as Exhibits B and C.  *See* Cp. ¶8.  And even if plaintiff could avoid being bound by his admission of the applicability of the REU plan, he cannot simultaneously claim the right to enjoy continue vesting of REUs under the terms of the REU plan, while ignoring other terms in the same plan that impose conditions on the vesting of those units.[6]  In short, because plaintiff's own allegations establish that the unvested portions of his REUs did not represent compensation he had earned for past services, Deutsche Bank could have terminated them outright on plaintiff's termination, as it was expressly entitled to do under the REU Plan.  Having chosen not to do so, Deutsche Bank may properly condition their future vesting on plaintiff's compliance with the non-solicitation condition in the REU Plan, as *Kroeger* makes clear.  Thus, as a matter of law plaintiff is not entitled to the declaration he seeks.

### B. Even if Plaintiff Were to Amend His Request for a Declaratory Judgment, He Would Not Be Entitled to a Declaration that the Non-Solicitation Condition in the REU Plan Is Unenforceable.

Faced with the obvious defect in his existing declaratory judgment claim, plaintiff changes tack.  He now claims that Count 4 should not be dismissed "because the plan provision in question is manifestly <u>unreasonab</u>le," an allegation that does not appear

---

*See* Cp. at ¶7 (plaintiff received incentive compensation in 2001, 2002, and 2003); Cp. at Exhibit A (plaintiff to receive $875,000 incentive compensation for 2001, of which at least 70% was to be in cash); Cp. at ¶13 (plaintiff received $251,094 in incentive compensation in 2003); Opp'n at 1-2 ("[e]ach year Davidson received a base salary of $125,000 and incentive compensation in an amount equal to or above this base salary").

[6]    Particularly in the face of the unambiguous language of the REU plan, plaintiff's vague assertion that the REUs, as well as his cash incentive awards, were "presented to me … as being for my performance in the prior period" does not suggest that the units were intended as compensation for past services, or that they were not subject to the terms of the REU plan. Affidavit of Christopher C. Davidson ("Davidson Aff.") at ¶2.

anywhere in his Complaint. Opp'n at 19 (heading of Section III) (emphasis added). Even if plaintiff were to amend his Complaint to make such an allegation, it could not support his claim for a declaratory judgment claim.

A declaratory judgment is appropriate only if there is an "actual controversy"; there must be "a real and substantial controversy admitting of specific relief through a decree of conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *See Aetna Life Ins. Co. of Hartford, Connecticut v. Haworth*, 300 U.S. 227, 241 (1937). A grant of declaratory relief rests in the sound discretion of the court exercised in the public interest. *See Public Affairs Press v. Rickover*, 369 U.S. 111 (1962). Moreover, a court "cannot be required to go into general propositions or prophetic statements of how it is likely to act upon other possible or even probable issues that have not yet arisen." *Mayhew v. Krug*, 98 F. Supp. 338, 340 (D.D.C. 1951). *See also American Fidelity & Casualty Co., Inc. v. Pennsylvania Threshermen & Farmers' Mutual Casualty Ins. Co.,* 280 F.2d 453, 461 (5th Cir. 1960) ("it is not the function of a United States District Court to sit in judgment on these nice and intriguing questions which today may readily be imagined, but may never in fact come to pass").

A declaratory judgment would plainly be improper here because plaintiff has failed to allege any facts suggesting that an actual controversy exists with respect to the non-solicitation condition in the REU plan. Plaintiff alleges that he "intends to seek employment with a Deutsche Bank competitor and, in the course of the performance of his duties for said competitor, it is likely that he will solicit Deutsche Bank clients." Cp. ¶35. In his affidavit, however, he asserts that he has not obtained new employment.

Davidson Aff. ¶6.  Thus, it is clear that plaintiff has not yet taken any steps that will necessarily lead to litigation over the non-solicitation provision in the immediate future, as is required to support a declaratory judgment claim.  Under similar circumstances, the court in *Bruhn v. STP Corp.,* 312 F. Supp. 903, 906 (D. Colo. 1970), dismissed a claim seeking a declaratory judgment that a non-compete provision was against public policy.  As the court explained, the plaintiffs had not alleged that they had begun preparations to compete with the defendant, and it was instead "clear that plaintiffs are merely apprehensive, but have not nevertheless even begun to pursue a course of action which would lead them down the path toward litigation."  *Id.*  For this reason, the declaratory judgment claim could not stand.

The problems with issuing a declaratory judgment under the similarly inchoate circumstances of this case are particularly acute in view of the principles that govern non-compete agreements in Massachusetts.  Contrary to plaintiff's evident belief, a conclusion that some aspects of a non-compete provision are unreasonable would not require a holding that the provision was unenforceable.  Instead, under Massachusetts law the court may enforce a non-compete provision "to the extent that it is reasonable."  *See Ferrofluidics Corp. v. Advanced Vacuum Components, Inc.,* 968 F.2d 1463, 1469 (1st Cir. 1992); *Pettingell v. Morrison, Mahoney & Miller*, 426 Mass. 253, 255, 687 N.E.2d 1237, 1239 (1997); *Kroeger,* 13 Mass. App. Ct. at 312, 432 N.E.2d at 568.  To render a declaratory judgment in this case at this time, the court would therefore have to determine the reasonableness of the various challenged aspects of the provision in a factual vacuum, and make pronouncements on many hypothetical matters as to which plaintiff's rights may never be affected.  It is plainly not this Court's function to do so.

Moreover, although the merits of plaintiff's challenges to the non-solicitation provision are not relevant to the viability of the declaratory judgment claim, defendants note that plaintiff's arguments amount to little more than a grossly exaggerated parade of horribles. Plaintiff is plainly wrong, for example, in claiming that the provision precludes plaintiff from soliciting all the clients Deutsche Bank has ever had "since its founding in 1870." Opp'n at 5. As noted in defendants' motion to dismiss, the Summary of the REU Plan (Exhibit B to the Complaint), which paraphrases the forfeiture condition, explains that forfeiture will occur if plaintiff "solicits [Deutsche Bank] clients with the effect or intention of <u>diverting business</u> from [Deutsche Bank]." MTD at 22 (emphasis added). Accordingly, the restriction is plainly limited to Deutsche Bank's <u>current</u> clients, not clients it had in the 19th century.

Plaintiff similarly errs in suggesting that Deutsche Bank has no legitimate interest in enforcing the non-solicitation provision. Deutsche Bank manifestly has a valid interest in ensuring that a former sales person does not divert its clients to a competitor.[7] Indeed, to the extent that plaintiff may benefit from Deutsche Bank's increased success when his REUs vest, plaintiff shares this interest with Deutsche Bank. That plaintiff must choose whether to continue to align himself with Deutsche Bank by refraining from soliciting its clients and thereby contribute to potential increases in Deutsche Bank's value (and thus the value of his own future equity interests in Deutsche Bank), or, on the other hand, to compete with Deutsche Bank and forfeit his right to future equity in Deutsche Bank, does not render the provision unreasonable.

---

[7] *See, e.g., Modis, Inc. v. The Revolution Group, Ltd.*, No. 991104 (Mass. Super. Ct. Dec. 29, 1999) (1999 WL 1441918 at *7-8) (non-solicitation provision protects legitimate corporate interests); *Oxford Global Resources, Inc. v. Consolo*, No. CA 024763BLS2 (Mass. Super. Ct. May 6, 2002) (2002 WL 32130445 at *5) (employer entitled to protect its contacts with clients through a non-solicitation agreement).

In short, because there is no basis for a declaratory judgment, whether under the theory asserted in the Complaint or any other, Count 4 should be dismissed.

## **CONCLUSION**

For the reasons discussed above, and in defendants' prior filings in support of their Motion to Dismiss, the plaintiff's Complaint fails to state any claim on which relief may be granted, and it should be dismissed in its entirety.

                                        DEUTSCHE BANK SECURITIES, INC.,
DEUTSCHE BANK AMERICAS HOLDING
CORPORATION, AND DEUTSCHE
BANK AMERICAS SEVERANCE PAY
PLAN,

By their attorneys,

/s/     Scott A. Roberts
Scott A. Roberts, BBO##550732
sroberts@swmlawyers.com
A. Lauren Carpenter, BBO#551258
lcarpenter@swmlawyers.com
SULLIVAN WEINSTEIN & McQUAY, P.C.
Two Park Plaza
Boston, MA 02116
Dated: September 20, 2004       617-348-4300